Order Amending Opinion And Denying Petition For Rehearing And Rejecting Suggestion For Rehearing En Banc And Amended Opinion
ORDER
The Opinion filed January 28,1998, slip op. 783, and appearing at 135 F.3d 618 (9th Cir.1998), is amended as follows:
1. At slip op. 829, last sentence of the first full paragraph; 135 F.3d at 640, first full sentence on the page beginning with “All Grower beds ... delete the sentence and replace it with, “The other Grower beds will be subject to the allocation analysis below.”
2. At slip op. 830, first full paragraph; 135 F.3d at 640, third full paragraph beginning with “We therefore apply ... ”; delete the entire paragraph and replace it with a new paragraph and revised footnote as follows:
“We therefore apply the following analysis to Grower beds where the Growers, or their predecessors, began their enhancement efforts on a natural bed. For such natural beds, the Growers shall demonstrate what portion of their harvest is due to their labor, as opposed to what portion would exist absent the Growers’ enhancement. See Shellfish II., 898 F.Supp. at 1462. For such enhanced natural beds, the Tribes shall be entitled to fifty percent of the pre-enhaneed sustainable shellfish production from those beds.12/ Of course, this allocation analysis does not apply to artificial beds, that is, to Grower beds that did not support a sustainable commercial density of shellfish prior to cultivation. As the Tribes have acknowledged, the Tribes have no right to harvest such beds. 898 F.Supp. at 1460-61.”
3.At slip op. 834, third full paragraph carrying over to p. 835; 135 F.3d at 642, third full paragraph beginning with “The Tribes argue ..delete the paragraph and replace it with five paragraphs as follows:
“Of particular concern to the Tribes is the restriction that allows the Growers to control access to natural clams by choosing not to harvest them in favor of the oysters under which the clams are found.” The Tribes describe this restriction as a “gaping loophole” that has the capacity at the Growers’ discretion to deny to them the very rights to natural clams which our holding confirms.
The Growers’ counter with the argument from the record that the process of harvesting natural clams from underneath the oyster beds can seriously disrupt and suffocate their oysters.
*638 On reflection, the Tribes’ concerns although certainly not fanciful-are based at this point on speculation as to what might happen in the future. The Growers, for example, represent that “where there are substantial economic benefits to a Grower from harvesting clams, the Grower will do so.” And, “[a]s soon as the Grower does, the trial court’s implementation plan provides that the Tribes have the right to a share of those clams.” The Growers say that they are “commercial farmers-if there is money to be made, the resource assuredly will be exploited.”
Under the circumstances, we believe that the district court’s restrictions do not amount at this time to an abuse of discretion. The district court attempted to fashion a prospective solution to a difficult situation by balancing the parties’ respective interests. The district court’s restrictions safeguard the Tribes’ right of access to the ancient fisheries, but also protect the interests of the Growers and Private Owners. Importantly, in this aspect of the court’s decision the court did not use equity as the basis for its interpretation of the decision, but only as a way to implement its correctly reasoned interpretation of the Proviso. While the Tribes may not be happy with the limits imposed on their harvesting, they are still able to effectuate their allocation under the Treaties and are not excluded from their ancient fisheries.
We are confident that any future practices by the Growers that trench inappropriately upon the Tribes’ rights as confirmed in this opinion will be adequately dealt with by the district court. The district court is the best place to manage any wrinkles that might crop up. The best way to avoid such problems, of course, is for the parties constructively to work together to respect each others’ rights.”
4. At slip op. 839, concurring opinion of Judge Beezer; 135 F.3d at 644; withdraw the entire opinion and replace with a new concurring opinion as reflected in the arnended opinion filed herewith.
With these amendments, the panel has voted unanimously to deny the petition for rehearing and to reject the suggestion for rehearing en banc.
The full eourt has been advised of the suggestion for rehearing en banc and no judge of the court has requested a vote on it. Fed. R.App. P. 35(b).
The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.
OPINION
TROTT, Circuit Judge.
I. OVERVIEW
The State of Washington, groups of private tideland property owners (“Private Owners”), and .commercial shellfish growers (“Growers”) (collectively, “Appellants”) appeal the district court’s judgment following two bench trials in an action brought by numerous Indian Tribes[1] (the “Tribes”) and the United States (on the Tribes’ behalf) seeking a declaration of rights to shellfish under the Stevens Treaties (“Treaties”). The United States and the Tribes cross-appeal the district court’s order implementing the Tribes’ rights.
In 1855, the United States negotiated five Treaties with the Tribes in the Western Washington Territory. The Tribes ceded their aboriginal lands to the United States for settlement, receiving in exchange exclusive title to defined lands, free medical care, schools, occupational training, and annuity payments. The Treaties also reserved to the Tribes the “right of taking fish, at all usual and accustomed grounds and stations ... in common with all citizens of the Territory. ... ” In a series of decisions beginning in 1974, federal courts, including the Ninth Circuit and the Supreme Court, held that this *639 treaty language entitles the Tribes to take fifty percent of the salmon and other free-swimming fish in the waters controlled by Washington State. The Tribes’ rights to shellfish under the Treaties, however, are limited by the following proviso (the “Shellfish Proviso”): “Provided, however, That they shall not take shellfish from any beds staked or cultivated by citizens.”
This case concerns the nature and extent of the Tribes’ shellfishing rights under the Treaties. The district court concluded in a thoughtful and well-reasoned opinion that the term “fish,” as used in the Stevens Treaties, includes shellfish. The court then concluded that the Tribes have a right to take one half of the harvestable shellfish of every species found anywhere within their usual and accustomed fishing areas, except as expressly limited by the Shellfish Proviso. The court interpreted the Shellfish Proviso “only to exclude Indians from artificial, or planted shellfish beds; [the parties to the Treaties] neither contemplated nor desired that the Indians would be excluded from natural shellfish beds.” United States v. Washington, 873 F.Supp. 1422, 1441 (W.D.Wash.1994). The court’s conclusions substantially reflect the position of the Tribes and of the United States, which the court found to be “overwhelmingly” supported by the historical evidence of the intent of the signatory parties to the Treaties.
After its decision interpreting the Treaties, the district court held a second trial to determine a plan for implementing the Tribes’ shellfishing rights (“Implementation Plan”). Employing principles of equity, the court refined its definition of “cultivated” under the Proviso and precluded the Tribes from harvesting shellfish on most of the commercial Growers’ property. In addition, the court placed time, place, and manner restrictions on the Tribes’ ability to harvest from privately-owned land. Finally, the court devised a system for the appointment and removal of Special Masters to resolve disputes arising from the Implementation Plan. These consolidated appeals followed.
We have jurisdiction under 12 U.S.C. § 1291, and we affirm in part and reverse in part.
II. HISTORICAL BACKGROUND
A. The Stevens Treaties
The record contains extensive persuasive evidence concerning the Tribes’ reliance on fish and shellfish for commercial, subsistence, and ceremonial purposes. Fishing was “not much less necessary to the existence of the Indians than the atmosphere they breathed.” United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). The United States Treaty negotiators, under the leadership of Governor Isaac Stevens, were well aware of the Tribes’ use and reliance on a wide variety of fish, including shellfish. “The United States’ primary purpose [in entering the Treaties] was to extinguish the Indians’ title to the lands in Western Washington, thereby clearing the way for settlement by Europeans.” United States v. Washington, 873 F.Supp. 1422, 1436 (W.D.Wash.1994) [hereinafter “Shellfish I ”]. Because of the Tribes’ extensive reliance on fish, however, “[t]he United States was aware that ... it was clearly neeessary to preserve the Indians’ fishing rights.” Id. “Whatever land concessions [the Tribes] made, the Indians viewed a guarantee of permanent fishing rights as an absolute predicate to entering into a treaty with the United States.” M at 1437.
At the time of the Treaties, a shellfish-cultivation industry had begun to develop at Shoalwater Bay in the Washington Territory. The United States treaty negotiators were familiar with the practices of that industry, which was modeled after the larger, older, and more developed shellfish industry on the East Coast of the United States. Id. at 1434. Shellfish farmers created “cultivated” beds (ones on which shellfish spawn would not naturally set) by removing oysters from their natural beds to areas where they could grow more rapidly, or by placing shells or other material to harden the bottom and thereby facilitate the setting of the oysters. In addition to creating cultivated beds, shellfish farmers frequently “staked” beds of shellfish by storing market-sized shellfish removed from other beds until they could be shipped to market. These staked beds did not natu *640 rally contain shellfish of the type being stored, and their boundaries were marked for identification purposes with stakes extending above the surface of the water at high tide. Id. at 1432-37.
Fish, including shellfish, were exceptionally abundant and considered inexhaustible at treaty time. Id. at 1438. Hence, the United States negotiators believed that preserving Indian fishing rights would not interfere with the rights of citizens. The “negotiators were aware of the thriving shellfish industry in fully-developed East Coast cities, and likely assumed based on those examples that development in the Puget Sound and on the western shore would not interfere with the Indians’ exercise of their treaty fishing rights.” Id.
In light of the above, the United States negotiated five treaties with Indian Tribes of the Western Washington Territory in 1854 and 1855.[2] Through each of these Treaties, in substantially identical language, the Tribes secured their preexisting right to take fish:
The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands: Provided, however, That they shall not take shell fish from any beds staked or cultivated by citizens....
Treaty of Medicine Creek, supra, Art. III.
B. Post-Treaty Developments
In the years immediately following the Treaties, the Indians harvested the majority of the shellfish resource. In 1879, however, the territorial legislature passed a law that, for the first time, allowed citizens the exclusive right to use and harvest natural oyster beds. Shellfish I, 873 F.Supp. at 1440. “Washington became a state in 1889, and in 1895 it passed legislation (the ‘Bush’ and ‘Callow[7]’ Acts) for private purchase of tidelands, even when those tidelands contained natural shellfish beds.” Id. Since that time, the State has sold off the “vast majority” of its tidelands to private owners. Id, at 1439.
Uncontradicted evidence at trial showed that native shellfish populations have declined dramatically and have been replaced to a large extent by foreign species introduced into the area after the Treaties. For example, native littleneck clams have been replaced by the introduced species, manila clams, wdiich comprised over eighty percent of the total clam harvest in the Puget Sound from 1988-90. This litigation-initiated by the Tribes and United States-is the consequence of the increasing competition for, and depletion of, the shellfish resource.
III. PROCEDURAL HISTORY
In 1970, the United States and the Tribes brought suit against the State of Washington seeking an interpretation of the Treaties and an injunction to enforce the Tribes’ fishing rights. See United States v. Washington, 384 F.Supp. 312, 327 (W.D.Wash.1974) [hereinafter “Washington / ”].
In Washington l, Senior Judge Boldt determined the nature and extent of the Tribes’ off-reservation fishing rights with respect to anadromous fish.[3] That decision established the locations of the Tribes’ usual and accustomed grounds and stations and found that the Tribes were entitled to take fifty percent of the harvestable fish from those grounds and stations. We affirmed in United, States v. Washington, 520 F.2d 676 (9th Cir.1975) [hereinafter “Washington II ”]. The Supreme Court substantially affirmed that decision, concluding that the trial court had correctly adjudicated the nature and extent of the Tribes’ fishing rights. Washington v. Washington State Commercial Passenger Fishing Vessel Ass’n, 443 U.S. 658, 99 S.Ct. 3055, 61 *641 L.Ed.2d 823 (1979) [hereinafter “Fishing Vessel"]. The Supreme Court’s decision in Fishing Vessel marks the seventh time that the Supreme Court has addressed the fishing clause of the Stevens Treaties.[4]
The district court in Washington I reserved jurisdiction to hear future unresolved issues arising out of the Treaties. Under the court’s procedures, the Tribes must bring a request for adjudication of their fishing rights to the court’s attention through the filing of a “Request for Determination.” Washington I, 384 F.Supp. at 419.
In 1989, pursuant to the above procedure, sixteen Indian Tribes, later joined by the United States, filed an action in the district court seeking a declaration of the nature and extent of their shellfishing rights.[5] The district court’s decision in Shellfish I interpreted the Treaties to award fifty percent of the shellfish harvest in Washington waters to the Tribes.
After announcing its decision in Shellfish I, the court conducted a six-day “implementation trial.” The purpose of the implementation trial was to receive evidence regarding proposed plans to implement Shellfish I. Parties submitted competing plans. On August 28, 1995, the district court announced its Implementation Plan. United States v. Washington, 898 F.Supp. 1453 (W.D.Wash.1995) [hereinafter “Shellfish II”]. In Shellfish II, the district court noted that “[t]he Shellfish Growers and Private Property Owners are, effectively, innocent purchasers who had no notice of the Tribes’ Treaty fishing light when they acquired their property.” Id. at 1457. “Consequently, it is incumbent upon this Court to use its equitable powers to effect a balance between the Tribes’ Treaty shellfishing right and the Growers’ and Owners’ interest in the peaceful enjoyment and/or commercial development of their property.” Id. The district court then made several important rulings.
First, the court ruled that, when the State acts on behalf of its citizens by developing artificial shellfish beds for recreational shell-fishing on state-owned tidelands, it is a “citizen” within the scope of the shellfish proviso, which exempts tribal harvesting from “beds staked or cultivated by citizens.” Id. at 1459-60. The effect of this ruling is to exclude the Tribes from shellfishing in state-created artificial beds.
Second, the court clarified the definition of a “natural shellfish bed” which may not be “staked or cultivated” in the future by the Growers. The court concluded that a “natural shellfish bed” is a “bed which is capable of sustaining a yield of shellfish that will support a commercial livelihood.” Id. at 1461. The court then found that the minimum density of manila clams that will support a commercial livelihood is 0.5 pounds of mature clams per square foot.
Third, the court i-edefined “artificial beds,” which are exempted by the Shellfish Proviso from the reach of the Tribes’ shellfishing rights. The court believed that it would be “very difficult” to determine whether beds on Growers’ properties were “artificial” or “natural” and that the Tribes should not benefit from the Growers’ efforts to enhance the shellfish resource on their own properties. Id. at 1461-62. The court therefore modified the definition of “cultivated” to encompass the “wide range of techniques used by the Growers to enhance production of shellfish *642 on their property.” Id. The court referred to these beds as “de facto artificial beds.” Id. at 1462 & n. 18. Under the court’s ruling, only “those beds whose existence is entirely due to the natural propagation of the species” are subject to the Tribes’ Treaty rights. Id. at 1462.
Fourth, the court imposed “time, place, and manner” restrictions on the Tribes’ right to shellfish on private properties. Id. at 1470-73. One such restriction was a blanket ban on upland access across private property absent consent by the owner.
The court also set forth dispute resolution procedures, calling for a panel of four special masters: one selected by the Tribes, one by the Growers, one by the Private Owners, and one by the State. Id. at 1475-76. A single master, drawn from the four, determines each dispute. Under the court’s decision, the masters have the power to award damages against Tribes who violate the Implementation Plan. Id.
In response to motions to reconsider its decision in Shellfish II, the district eourt amended its decision on December 18, 1995. United States v. Washington, 909 F.Supp. 787 (W.D.Wash.1995) [hereinafter “Shellfish III’’]. In Shellfish III, the court revised its ban on upland tribal access to shellfish beds absent consent of the landowner by allowing tribes to cross private land after a showing of “the absence of access by boat, public road, or public right-of-way.” Id. at 793. Disputes over access must be presented to a special master. Id. at 791-93. The court also changed its decision allowing the special master to award damages against the Tribes. The master is still able to award damages against individual tribal members who damage private property during exercise of fishing rights, but he or she cannot award damages against the Tribes themselves. Id. at 793-94.
IV. STANDARD OF REVIEW
All parties agree that the meaning of the Treaty language is ultimately a question of law reviewed de novo. United States v. Washington, 969 F.2d 752, 754 (9th Cir.1992). Although several Private Owner groups assert that the district court’s findings regarding the “negotiators’ intentions and expectations” are mixed issues of law and fact reviewed de novo, we have previously reviewed a district court’s findings of parties’ intent in entering Indian Treaties “[u]nder the highly deferential clear error standard.” See, e.g., Confederated Tribes of Chehalis Indian Reservation v. Washington, 96 F.3d 334, 343 (9th Cir.1996), cert. denied, — U.S. -, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997). We therefore review for clear error all of the district court’s findings of historical fact, including its findings regarding the treaty negotiators’ intentions. We then review de novo whether the district court reached the proper conclusion as to the meaning of the Shellfish Proviso given those findings.
We review for an abuse of discretion the district court’s equitable orders. The district court abuses its discretion when its equitable decision is based on an error of law or a clearly erroneous factual finding. Foster v. Skinner, 70 F.3d 1084, 1087 (9th Cir.1995).
V. CANONS OF TREATY CONSTRUCTION
“[A]ll Treaties made, ... under the Authority of the United States, shall be the supreme Law of the Land and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const. Art. VI, cl. 2. The goal of treaty interpretation is to determine what the parties meant by the treaty terms. Shoshone Indians v. United States, 324 U.S. 335, 353, 65 S.Ct. 690, 89 L.Ed. 985 (1945). “[I]t is the intention of the parties ... that must control any attempt to interpret the treaties.” Fishing Vessel, 443 U.S. at 675, 99 S.Ct. 3055. This analysis of the parties’ intentions “begin[s] with the text of the treaty and the context in which the written words are used.” Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 534, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (internal quotations and citations omitted). “ ‘[Treaties are constructed more liberally than private agreements, and to ascertain their meaning we may look beyond written *643 words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.’ ” Id. at 535, 111 S.Ct. 1489 (quoting Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32, 63 S.Ct. 672, 87 L.Ed. 877 (1943)).
The Shellfish Proviso is an exception to the Tribes’ broad fishing rights. “A proviso is strictly construed, and only those subjects expressly restricted are freed from the operation of the statute.” Sutherland on Statutory Construction, § 20.22, at 110 (5th ed.1992).
Courts have uniformly held that treaties must be liberally construed in favor of establishing Indian rights. Confederated Tribes of Chehatis, 96 F.3d at 340. “Any ambiguities in construction must be resolved in favor of the Indians.” Id. (citation omitted). “These rules of construction ‘are rooted in the unique trust relationship between the United States and the Indians.’ ” Id. (quoting Oneida County v. Oneida Indian Nation, 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985)).
VI. DISCUSSION
A. EXCEPT AS LIMITED BY THE SHELLFISH PROVISO, THE RIGHT OF TAKING SHELLFISH UNDER THE TREATIES IS COEXTENSIVE WITH THE RIGHT OF TAKING FISH.
The district court held that the Treaties grant the Tribes a right to take shellfish of every species found anywhere within the Tribes’ usual and accustomed fishing areas, except as expressly limited by the Shellfish Proviso. We agree.
1. The Tribes’ shellfish rights are not limited by species
The State of Washington argues that the Tribes’ right to take shellfish is limited to those species of fish actually harvested by the Tribes prior to the signing of the Treaties.[6] Specifically, Washington contends that the tribes have no Treaty right to certain “deep-water” species[7] of shellfish that were not historically harvested in shallower waters and on tidelands. We respectfully reject this contention because it is plainly inconsistent with the language of the Treaties, the law of the case, and the intent and understanding of the signatory parties. See Shellfish I, 873 F.Supp. at 1430.
With all deference to the State, there is no language in the Treaties to support its position: the Treaties make no mention of any species-specific or technology-based restrictions on the Tribes’ rights. The district court aptly noted that, had the Treaty parties intended to limit the harvestable species, the parties would not have chosen the word “fish.” The word “fish” has “perhaps the widest sweep of any word the drafters could have chosen.” Id. Thus, the district court correctly chose not to “deviate from [the Treaties’] plain meaning.” Id.
Washington’s position is also contrary to the law-of-the-case doctrine. In 1974, Judge Boldt rejected an argument similar to Washington’s current position, stating: “The right secured by the treaties to the Plaintiff tribes is not limited as to species of fish, the origin of fish, the purpose or use or the time or manner of taking.... ” Washington I, 384 F.Supp. at 401. Moreover, the court determined that the Treaties “do not prohibit or limit any specific manner, method, or purpose of taking fish.” Id. at 402. We previously affirmed these conclusions “in all respects,” Washington II, 520 F.2d at 693, and we continue to believe they are correct.
Washington relies heavily on the Supreme Court’s statement in Fishing Vessel that “securing” fishing rights is “synonymous with ‘reserving’ rights previously exercised.” 443 U.S. at 678, 99 S.Ct. 3055 (emphasis added). Washington’s contention, however, is contrary to the recognized principle that the Treaties involved a grant of rights from the Indians to the United States. United States v. Winans, 198 U.S. 371, 380-81, 25 S.Ct. *644 662, 49 L.Ed. 1089 (1905). In Winans, the Supreme Court upheld the Indians’ right of access over private property in order to fish in the Columbia River. Id. at 384, 25 S.Ct. 662. The Court construed the fishing rights in the Stevens Treaty as “not a grant of rights to the Indians, but a grant of rights from them-a reservation of those not granted”. Id. As the district court explained:
At [Treaty] time, ... the Tribes had the absolute right to harvest any species they desired, consistent with their aboriginal title.... The fact that some species were not taken before treaty time-either because they were inaccessible or the Indians chose not to take them-does not mean that their right to take such fish was limited. Because the “right of taking fish” must be read as a reservation of the Indians’ preexisting rights, and because the right to take any species, without limit, pre-existed the Stevens Treaties, the Court must read the “right of taking fish” without any species limitation.
Shellfish /, 873 F.Supp. at 1430 (citation omitted). A more restrictive reading of the Treaties would be contrary to the Supreme Court’s definitive conclusion that the Treaties are a “grant of rights from” the Tribes. Winans, 198 U.S. at 380, 25 S.Ct. 662. We therefore reject Washington’s argument that the Tribes are limited in the species of shellfish they harvest.
2. The “usual and accustomed grounds and stations” do not vary by species offish
Appellants argue that the district court erred in holding that the right of taking fish within “all usual and accustomed grounds and stations” of a Tribe does not vary by species of fish. They contend that the Tribes’ “usual and accustomed” fishing grounds for shellfish are not coextensive with the usual and accustomed grounds for the taking of other fish, the boundaries of which were determined in Washington I. They suggest that the Tribes must establish their usual and accustomed grounds for each species of fish. We respectfully disagree.
In Washington I, the court found that “every fishing location where members of a tribe customarily fished ... is a usual and accustomed ground or station at which the treaty tribe reserved, and its members presently have, the right to fish.” 384 F.Supp. at 332. That court heard extensive evidence and made findings with respect to each Tribes’ usual and accustomed fishing grounds. Id. at 359-82. Since the time Judge Boldt made these findings, courts considering fishing disputes under the Treaties have never required species-specific findings of usual and accustomed fishing grounds. In fact, the district court in a prior proceeding on a related Stevens Treaties case found that the usual and accustomed grounds and stations for herring (a non-anadromous fish) were co-extensive with those previously adjudicated for salmon (an anadromous fish). United States v. Washington, 459 F.Supp. 1020, 1049 (W.D.Wash.1978) (ruling that the tribes may take herring at all of its usual and accustomed fishing places to the same extent and subject to the same terms and conditions as specified in Washington I).
Moreover, it would be extremely burdensome and perhaps impossible for the Tribes to prove their usual and accustomed grounds on a species-specific basis. “Little documentation of Indian fishing locations in and around 1855 exists today.” 459 F.Supp. at 1059. If each Tribe were required to prove its usual and accustomed grounds for every species of fish and shellfish, the time and cost to the court and parties would be unreasonably burdensome.
In light of the above, the district court was correct in concluding that the Tribes’ usual and accustomed grounds for shellfish are coextensive with the Tribes’ usual and accustomed fishing grounds, w’hich have been previously decided by the courts.
3. The Equal Footing Doctrine does not preclude tribal harvesting.
Appellants contend that the “Equal Footing Doctrine” and the “Shively presumption” preclude tribal harvesting on the tidelands. “Under the Equal Footing Doctrine, every new state is entitled to entrance into the Union free of any encumbrance on its land, so that it stands on ‘equal footing’ with the other states.” Shellfish I, *645 873 F.Supp. at 1442-43 (citing Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894)). “The 'Shively presumption’ is an outgrowth of this doctrine, and holds that any pre-statehood grant of property does not include tidelands unless the grant clearly indicated that tidelands were included.” Id. at 1443 (citation omitted). We conclude that the language of the Treaties, the law of this ease, and the Supreme Court’s prior applications of the Equal Footing Doctrine all counsel against its application in the instant ease.
In short, Appellants contend that any treaty right to harvest shellfish would amount to a property interest in the tidelands, and because the Treaties do not clearly specify an intent to grant a property interest in the tidelands, the Treaties cannot be construed as providing rights to harvest shellfish. The district court rejected this argument and interpreted the Treaties “without regard to the Equal Footing Doctrine ra-the Shively presumption.” Id, We agree with the district court’s interpretation.
Appellants rely primarily on two cases, United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926), and Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Both cases involved disputes over Indian title rights to lands underlying navigable waters. In both cases, the Supreme Court applied the Shively presumption and concluded that the treaties at issue “did not by [their] terms, formally convey any land to the Indians at all.” Montana, 450 U.S. at 553, 101 S.Ct. 1245. In Holt State Bank, the Court concluded “there was nothing in [the treaties] which even approaches a grant of rights in lands underlying navigable waters.” 270 U.S. at 58, 46 S.Ct. 197.
In the instant case, however, “the Tribes possess the disputed rights [to harvest shellfish] pre-treaty, and the treaty simply effects a reservation of rights.” 873 F.Supp. at 1443. As the district court stated:
It is settled under Washington II that the fishing rights at issue in this case predated the Stevens Treaties, and the Treaties simply effected a reservation of those rights. Similarly, the Supreme Court acknowledged the reservation in Fishing Vessel: The fishing clause speaks oí securing certain fishing rights, a term the Court has previously interpreted as synonymous with ‘reserving’ rights previously exercised.” Fishing Vessel, 443 U.S. at 678, 99 S.Ct. 3055. Because the Stevens Treaties must be construed as a reservation of rights by the Tribes, not a granting of rights by the United States, the Shively presumption and the Equal Footing Doctrine cannot play a role in the evaluating the existence or scope of the rights.
Id, at 1443-44 (citation omitted). We adopt the district court’s persuasive reasons for rejecting the application of the Shively presumption to defeat the Tribes’ shellfishing rights.
We note that “the Supreme Court has applied the Equal Footing Doctrine in one context only, namely when evaluating a claim of right to lands beneath navigable waters based upon an alleged conveyance or retention of fee simple ownership by the United States prior to statehood.” Id, at 1444 (citing cases); see Montana, 450 U.S. at 550-51, 101 S.Ct. 1245 (“The question is whether the United States conveyed beneficial ownership of the riverbed to the Crow Tribe by the Treaties of 1851 or 1868.”); Holt State Bank, 270 U.S. at 57, 46 S.Ct. 197 (adjudicating the question of “whether the lands under the lake were disposed of by the United States before Minnesota became a state”); Utah Div. of State Lands v. United States, 482 U.S. 193, 204, 107 S.Ct. 2318, 96 L.Ed.2d 162 (1987) (The United States answered in the district court that title to the lakebed remained in federal ownership by selection of the lake as a reservoir site prior to Utah’s statehood). Unlike the above cases, the instant case does not involve ownership of tidelands. The Tribes do not claim ownership of the tidelands; the Tribes merely assert their right to harvest shellfish within the tidelands, regardless of ownership.
Moreover, application of the Equal Footing Doctrine has already been rejected in the context of the Stevens Treaties fishing rights. First, the Supreme Court in Winans noted:
*646 [I]t is contended that the State acquired, by its admission into the Union “upon an equal footing with the original States," the power to grant rights in or to dispose of the shore lands upon navigable streams, and such power is subject only to the paramount authority of Congress with regard to public navigation and commerce. The United States, therefore, it is contended, could neither grant nor retain rights in the shore or to the lands under water.
[[Image here]]
The extinguishment of the Indian title, opening the land for settlement and preparing the way for future States, were appropriate to the objects for which the United States held the Territory. And surely it was within the competency of the Nation to secure to the Indians such a remnant of the great rights they possessed as “taking fish at all usual and accustomed places.”
198 U.S. at 382-84, 25 S.Ct. 662. Similarly, Appellants’ Equal Footing arguments have been rejected in this case:
Admission of the State of Washington into the Union upon an equal footing with the original states had no effect upon the treaty rights of the Plaintiff tribes. Such admission imposed upon the State, equally with other states, the obligation to observe and carry out the provisions of treaties of the United States.
Washington I, 384 F.Supp. at 401. Thus, we can identify no reason or rule that would mandate the application of the Equal Footing Doctrine to limit the Tribes’ fishing rights in this case. The language of the Treaties, the law of this case, and the Supreme Court’s prior applications of the Equal Footing Doctrine all preclude its application here.
4. The Tribes are entitled to harvest shellfish on privately-owned tidelands.
The Private Owners contend that the Tribes’ right to take shellfish does not include the right to take shellfish found on privately-owned tidelands. The Private Owners argue that the Treaties gave the Tribes the same common right to harvest shellfish as that enjoyed by non-Indian citizens, and that this common light was diminished by the conveyance of the property into private ownership. They contend also that the Treaties only allow the Tribes to take the common resources of “public water and public lands,” not to take shellfish on private lands. We reject these contentions.
First, the Supreme Court has consistently rejected arguments to the effect that Indian treaties reserve to the Indians no more fishing rights than those enjoyed by non-Indian citizens. See Winans, 198 U.S. at 380, 25 S.Ct. 662 (rejecting lower court ruling that Indians had no more rights than any inhabitant of the Territory); Fishing Vessel, 443 U.S. at 676-77 & n. 22, 99 S.Ct 3055 (rejecting argument that Indians only possessed rights in common with other citizens).
Second, as the Supreme Court explained in Winans, the Tribes were promised “the right of taking fish at all usual and accustomed places” and the right “of erecting temporary buildings for curing them.” 198 U.S, at 381, 25 S.Ct. 662. “The contingency of future ownership of the lands, therefore, was foreseen and provided for” and, “in other words, the Indians were given a right in the land.” Id. Winans directly contradicts the Private Owners’ argument: the Supreme Court has made clear that the Tribes’ fishing rights in their usual and accustomed places are not diminished by private ownership of those lands. In fact, the Court noted that the Treaties “imposed a servitude upon every piece of land as though described therein.” Id.
Moreover, in Fishing Vessel, the Supreme Court explicitly recognized that the “[TJreaties provide Indians with certain rights-i.e., the right ... to cross private lands-that non-Indians do not have.” Fishing Vessel, 443 U.S. at 676 n. 22, 99 S.Ct. 3055. The district court acknowledged this right in Shellfish HI and correctly concluded that:
[U]pon proper showing of the need for land access, the Tribes would be entitled under Winans to cross private property in order to exercise their fishing rights. Resolving the issue of Tribal access across private property requires the balancing of competing interests, and the Court empha *647 sizes that land access is not to be granted unless there is a proper showing of the need for such.
909 F.Supp. at 792.
This case is not the first Stevens Treaties case to implicate private property rights. The previous fishing rights cases, upheld in Fishing Vessel, noted that the Treaties “include! ] the right to use private tidelands for beach seines, tidal impoundment traps, stake nets and reef nets.” Shellfish I, 873 F.Supp. at 1444; see Washington I, 384 F.Supp. at 360-61, 378. Appellants’ attempts to distinguish the anadromous fishing rights from the shellfishing rights are not persuasive. The Supreme Court has said that “[i]t is absolutely clear, as Governor Stevens himself said, that neither he nor the Indians intended that the latter should be excluded from their ancient fisheries, and it is accordingly inconceivable that either party deliberately agreed to authorize future settlers to crowd the Indians out of any meaningful use of their accustomed places to fish.” Fishing Vessel, 443 U.S. at 676, 99 S.Ct. 3055.
The Private Owners also contend that shellfish are different than anadromous fish because they have traditionally been held to be a part of the land. The district court rejected this contention, stating that “the uniform common law at treaty time held that private ownership of a parcel of tideland did not include private rights to the shellfish on that parcel.” Shellfish I, 873 F.Supp. at 1439. In support of this proposition, the district court cited Joseph Angell’s 1847 Treatise on the Right of Property in Tide Waters, which states that “[t]here is no doubt, that the public have a right to take shellfish on the shore, though the right of soil in the shore happens to be private property.”
On appeal, both the Tribes and the Private Owners cite several cases in support of their respective contentions that the right to harvest shellfish from private property was (or was not) permitted at Treaty time. See Smith v. Maryland, 59 U.S. (18 How.) 71, 74-75, 15 L.Ed. 269 (1855) (stating that “the enjoyment of certain public rights” included “the common liberty of taking fish, as well shellfish as floating fish”); Martin v. Waddell, 41 U.S. (16 Pet.) 367, 413-14, 10 L.Ed. 997 (1842) (noting that public rights applied “as well for shell-fish and floating fish”). But see Den v. The Jersey Co., 56 U.S. 426, 432-33, 15 How. 426, 14 L.Ed. 757 (1853) (“Clams ordinarily live in the soil under the waters, and not within the waters.... They therefore, in a very material sense, belong with the land.”). Regardless of whether shellfish were a private or public resource at treaty time, or today, the Treaties secured the Tribes’ right to fish at their usual and accustomed grounds and stations. The Tribes therefore acquired the right to take shellfish from the tidelands within their usual and accustomed grounds, without regard to the public or private nature of their ownership. As the district court stated in Washington /, “[b]ecause the right of each treaty tribe to take anadromous fish alises from a treaty with the United States, that right is reserved and protected under the supreme law of the land, does not depend on state law, is distinct from rights or privileges held by others, and may not be qualified by any action of the state.” 384 F.Supp. at 402. Thus, whatever the status of the state law at the time of the Treaties or today, the Treaties represent the supreme law of the land and give to the Tribes the right to take shellfish from private tidelands. See Fishing Vessel, 443 U.S. at 682, 99 S.Ct. 3055 (stating that “neither party to the treaties may rely on the State’s regulatory powers or on property law concepts to defeat the other’s right to a ‘fairly apportioned’ share of each covered run of harvestable anadromous fish”) (emphasis added).
In light of Winans, Fishing Vessel and the Treaties’ language and power as the supreme law of the land, the district court correctly determined that the Tribes have a right to harvest shellfish on private tidelands.
B. THE DISTRICT COURT PROPERLY INTERPRETED THE MEANING OF THE SHELLFISH PROVISO.
The Treaties’ fishing clauses were expressly limited by the Shellfish Proviso, which prohibited the Tribes from taking shellfish from “any beds staked or cultivated by citizens.” The district court “interpreted] the terms ‘staked’ and ‘cultivated’ as *648 the terms were defined and used in the shell-fishing industry at and before treaty time.” 873 F.Supp. at 1441. The district court concluded that, when the signatory parties used those terms in the Proviso, “they intended only to exclude Indians from artificial, or planted, shellfish beds; they neither contemplated nor desired that the Indians would be excluded from natural shellfish beds.” Id. “Therefore, the words ‘any beds staked or cultivated by citizens,’ describe artificial shellfish beds created by private citizens.” Id,
The Growers offered the district court an alternative definition of staked or cultivated that “starts and ends with the treaty-time dictionary.” Id. at 1431. The district court noted that under the Growers’ theory, “any shellfish bed extant today that is surrounded by stakes, or in some fashion improved by human labor, would be off limits to the Indians.” Id. The Private Owners make a similar contention, arguing that “ ‘staked’ should be interpreted in its ‘frontier’ context and thus should be regarded as a synonym for ‘claimed as private property.’ Therefore, all privately-owned tideland, whether or not surrounded by stakes, would be protected by the Shellfish Proviso.” Id, The district court rejected the Growers’ and Private Owners’ definitions, analyzing the Shellfish Proviso in light of: (1) the surrounding treaty words, (2) the record of the treaty negotiations, (3) the historical circumstances that gave rise to the Stevens Treaties, (4) the possible alternative formulations of the Shellfish Proviso, and (5) the post-treaty conduct of both parties. Id, at 1435. In short, the court found that “the Tribes presented compelling evidence that only artificial beds were ‘staked’ or ‘cultivated’ at treaty time.” Id. at 1431-42. Given the deferential standard by which we review the district court’s findings of historical fact and its findings regarding the intentions of the parties’ negotiators, we conclude the district court did not err in interpreting the Proviso and we adopt its analysis as our own. Moreover, we believe that the district court's reasoned analysis of the Proviso is correct. We emphasize three additional points.
First, the Growers’ and Private Owners’ interpretations are not based on the common understanding of the phrase “beds staked or cultivated” within the context of the shellfish-ing industry at treaty time. The district court made a factual finding that the treaty negotiators drew the language of the Shellfish Proviso from terms commonly used in the fledgling shellfishing industry. Although the Growers may have presented evidence to the contrary, none of this evidence leaves us with a “definite and firm conviction” that a mistake has been committed. See Sawyer v. Whitley, 505 U.S. 333, 346 n. 14, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). It was therefore not clear error for the district court to have rejected Appellants’ interpretation and to have adopted the Tribes’ position.
Second, the Growers’ interpretation is totally inconsistent with the “United States’ avowed intention to preserve for the Indians their ancient fisheries.” Id. at 1437. The Growers’ and Private Owners’ interpretations would read the Proviso to effectively eliminate the Tribes’ right to take shellfish under the Treaties. Surely, Governor Stevens would not have intended such a result, especially in light of the historical circumstances surrounding the Treaties’ negotiations. In fact, the benevolent approach taken by the United States treaty negotiators was noted by the Supreme Court in Fishing Vessel:
Governor Stevens made the following statement to the Indians gathered at Point-No-Point to negotiate the treaty beaxing that name: “Are you not my children and also children of the Great Father? What will I not do for my children, and what will you not for yours? Would you not die for them? This paper is such as a man would give to his childx-en and I will tell you why. This paper gives you a home. Does not a father give his children a home? ... This paper secures your fish Does not a father give food to his children?”
443 U.S. at 667 n. 11 99 S.Ct. 3055 (emphasis added). Likewise, the district court in this case aptly noted:
The one significant promise for purposes of this litigation is the promise by the United States to the Indians that they *649 would enjoy a permanent right to fish as they always had. This right was promised as a sacred entitlement, one which the United States had a moral obligation to protect. The Indians were repeatedly assured that they would continue to enjoy the right to fish as they always had, in the places where they had always fished. There is no indication in the minutes of the treaty proceedings that the Indians were ever told that they would be excluded from any of their ancient fisheries.
Shellfish I, 873 F.Supp. at 1435. Were we to adopt the Growers’ definition of staked or cultivated, we would be providing “an impotent outcome to negotiations and a convention which seemed to promise more, and give the word of the nation for more.” Winans, 198 U.S. at 380, 25 S.Ct. 662.
Third, the Appellants’ interpretation of the Proviso casts aside black-letter canons of statutory construction and treaty interpretation. The Shellfish Proviso is an exception to the Tribes’ otherwise broad fishing rights. “A proviso is strictly construed, and only those subjects expressly restricted are freed from the operation of the statute.” Sutherland on Statutory Construction, § 20.22, at 110 (5th ed.1992). Moreover, courts have uniformly held that treaties must be liberally construed in favor of the Indians. Confederated Tribes of Chehalis, 96 F.3d at 340. “These rules of construction ‘are rooted in the unique trust relationship between the United States and the Indians.’ ” Id, (quoting Oneida County v. Oneida Indian Nation, 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985)). The Appellants’ interpretation of the Proviso would render meaningless the above canons of construction and interpretation.
C. THE DISTRICT COURT CORRECTLY REJECTED APPELLANTS’ AFFIRMATIVE DEFENSES.
The Growers contend that we should apply the doctrine of laches to defeat the Tribes’ claim to shellfish. The doctrine of laches is defined as “neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to [the] adverse party, operates as [a] bar in [a] court of equity.” Black’s Law Dictionary 875 (6th ed.1990). In urging us to apply laches, the Growers argue that “this is an extraordinary case.... These extraordinary facts call for new law.” Growers’ Open ing Brief at 44.
The Growers ask for new law simply because current law precludes their argument. In Swim ¶. Bergland, 696 F.2d 712, 718 (9th Cir.1983), we held that “laches or estoppel is not available to defeat Indian treaty rights.” Although the equities do weigh heavily in favor of the Growers’ argument-the Tribes waited 135 years to assert their shellfishing rights-the law does not support their claim. See Board of County Comm’rs v. United States, 308 U.S. 343, 350-51, 60 S.Ct. 285, 84 L.Ed. 313 (1939) (defenses based on delay in bringing claims such as laches and estoppel are inapplicable to claims to enforce Indian rights). Once again, we reiterate that we are interpreting a treaty, and that treaties enjoy a unique position in our law.
UPOW’s argument that the Tribes’ treaty rights were extinguished by the Indian Claims Commission Act, 25 U.S.C. § 70 (repealed 1978), is without merit. Judge Boldt rejected this theory over twenty years ago, see United States v. Washington, 459 F.Supp. 1020, 1039-42 (W.D.Wash.1978), and we reject it here for the same reasons.
D. THE DISTRICT COURT ABUSED ITS DISCRETION IN LIMITING THE TRIBES’ RIGHT TO HARVEST SHELLFISH FROM CERTAIN AREAS BECAUSE THE DISTRICT COURT’S ORDER REDEFINED THE TERMS OF THE TREATY.
In their cross-appeal, the Tribes and the United States contend that, in its implementation decision (Shellfish II), the district court disregarded its own admonition in its first decision that it lacked authority to rewrite or interpret the terms of the treaties to avoid hardship to any party based on its own notions of the equities. The implementation decision, the Tribes contend, erroneously redefined the terms of the treaties in abrogation of the Tribes’ right to take shellfish. For example, the district court refined its definition of the word “cultivated” in the *650 Proviso and imposed “time, place, and manner” restrictions on the Tribes’ ability to harvest shellfish.
We hold that the district court impermissi-bly employed equitable powers to rewrite the Treaties’ terms. However, we also hold that allocating fifty percent of the commercial Growers’ shellfish harvest to the Tribes would unjustly enrich them. Such an allocation would simply not comport with Fishing Vessel ⅛ concept of giving the Tribes a “fair share” of the harvest.
1. The district court improperly limited the Tribes’ right to take shellfish from the Growers’ shellfish beds.
In Shellfish II, the district court declared that “it is incumbent upon this Court to use its equitable powers to effect a balance between the Tribes’ Treaty shellfishing right and the Growers’ and Owners’ interest in the peaceful enjoyment and/or commercial development of their property.” Id. Using these “equitable powers,” the district court formulated a “broader” definition of a “cultivated” shellfish bed that applies only to “the existing beds on property owned or leased by Growers licensed by the State of Washington.” Id. at 1461. The court then deemed natural shellfish beds that have been enhanced by human means “de facto artificial beds” upon whieh the Tribes may not take shellfish.[8] hi at 1462. “Permitting the Tribes to harvest fifty percent of the shellfish from de facto artificial beds would confer a windfall on the Tribes, and w'ould neither protect nor encourage the growth of the shellfish industry.” Id.
In support of its use of equitable principles, the district court and Appellants primarily rely on five cases: Yankton Sioux Tribe of Indians v. United States, 272 U.S. 351, 357, 47 S.Ct. 142, 71 L.Ed. 294 (1926) (awarding Indians monetary payment rather than ejecting “innumerable innocent purchasers” from tribal land); South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 519 n. 5, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986) (Blackmun, J., dissenting) (citing Yankton and acknowledging that equitable considerations might have limited the remedies available had the plaintiff tribe prevailed on its claim to 144,000 acres of land); County of Oneida v. Qmida Indian Nation, 470 U.S. 226, 260, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (Stevens, J., dissenting) (urging that laches be applied to bar Indians’ claim to lands); Brooks v. Nez Perce County, Idaho, 670 F.2d 835 (9th Cir.1982) (in an action to quiet title to a parcel of land, equitable considerations w’ould not bar the claim to the land entirely, but “[l]ack of diligence by the government in exercising its role as trustee may be weighed by the district court in calculating damages” for several decades of loss of use of the land); United States v. Imperial Irrigation Dist, 799 F.Supp. 1052 (S.D.Cal.1992) (employing tort-law equitable principles to award monetary damages to the plaintiff Indians, rather than restoring tribal land to them).
None of the above cases, however, involve the use of equitable considerations in interpreting Indian treaties. At best, they condone the use of equity as a tool to calculate damages. The majority in One,ida, 470 U.S. at 244, 105 S.Ct. 1245, stated that “it is far from clear that [laches] is available in suits such as this one” to restore Indian lands to Indians pursuant to treaty rights. In fact, in the terse three-page Brooks opinion, the court concluded that laches was not a valid bar to the Indians fifty-four-year-old complaint for a parcel of land. 670 F.2d at 837, Brooks had nothing to do with interpretation of an Indian treaty, but merely concluded that the lengthy delay in pursuing the action could be used in “calculating damages.” Here, by contrast, the district court is using equitable principles to assist in fashioning *651 the remedy and in interpreting the Treaty.[9]
The Tribes, on the other hand, cite persuasive and unambiguous Supreme Court authority. The district court’s re-interpretation violates the Supreme Court’s admonition in United States v. Choctaw Nation, 179 U.S. 494, 532-33, 21 S.Ct. 149, 45 L.Ed. 291 (1900), a seminal Indian treaty interpretation case:
But in no case has it been adjudged that the courts could by mere interpretation or in deference to its view as to what was right under all the circumstances, incorporate into an Indian treaty something that was inconsistent with the clear import of its words.... We are not at liberty to dispense with any of the conditions or requirements of the treaty, or to take away any qualification or integral part of any stipulation, upon any notion of equity or general convenience, or substantial justice,
(emphasis added; quotation and citation omitted). The district court itself recognized in Shellfish I:
In reaching its decision, the Court may not rewrite the Treaties or interpret the Treaties in a way contrary to settled law simply to avoid or minimize any hardship to the public or to the intervenors. Indeed, the Court has no such power. Rather, amelioration from such hardships should be sought from Congress, which has the power to abrogate the treaty....
873 F.Supp. at 1429. See also Choctaw, 179 U.S. at 531-32, 21 S.Ct. 149 (citing cases in support of rule that “the language used in treaties with the Indians should never be construed to their prejudice” and that words should be construed as they “were understood by this unlettered people, rather than their critical meaning”). Under these rules of construction, the Choctaw precedent, and the district court’s own statements in Shellfish I, the district court abused its discretion by applying notions of equity to redefine the term “cultivate.”
It does not follow from the above, however, that the district eourt is without the ability to use equity in implementing its Treaty interpretation. As laid out below, we believe the district court should have used its equitable powers only to limit the take of the Tribes-not the location-so as to avoid any unjust enrichment.
2. The district court improperly allocated to the Tribes a fifty-percent share of shellfish from the Growers’ beds.
Appellants contend that Tribes’ allocation of fifty-percent of the shellfish resource exceeded their “fair share.” Appellants suggest that the district court should have considered “equitable factors” and that it improperly applied the “moderate living” analysis suggested by the Supreme Court in Fishing Vessel, 443 U.S. at 684-686, 99 S.Ct. 3055. Although we conclude that the district court correctly applied Fishing Vessel ⅛ moderate living analysis, we hold that the district court should have used equitable principles to limit the Tribe’s shellfish harvest from the Growers’ beds to a “fair share.”
In Fishing Vessel, the Court stated that an equitable measure of the common right should initially divide the harvestable portion of each ran that passes through a “usual and accustomed” place into approximately equal treaty and non-treaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount. 443 U.S. at 685, 99 S.Ct. 3055. The Court elaborated on this concept:
[T]he central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than is necessary to provide the Indians with a livelihood-that is to say, a moderate living.... If, for example, a tribe should dwindle to just a few members, or if it should find other sources of support that lead it to abandon its fisheries, a 45% or 50% allocation of an entire run that passes through its customary fishing grounds would be manifestly inappro *652 priate because the livelihood of the tribe under those circumstances could not reasonably require an allotment of a large number of fish.
Id. at 686-87, 99 S.Ct. 3055. Appellants contend that the district court’s allocation of fifty percent of the shellfish resource goes beyond what is necessary to afford the Tribes a “moderate living.”
The district court, however, heard evidence as to the Tribes’ living standards presented by both sides and concluded that Appellants’ experts’ analyses were “flawed.” [10] The district court made the following finding:
The uncontroverted evidence presented at trial is that the Tribes lag significantly behind other residents of the State of Washington in their overall standard of living. For example, approximately one in three Tribal members live below the poverty level; Indians in the State of Washington endure health circumstances characterized by the State as “very poor;” tribal members have per capita incomes that are less than one half the per capita income of non-tribal residents of the State; and tribal members suffer from unemployment rates at least three times greater than that of all non-tribal residents of the State of Washington.
Shellfish I, 873 F.Supp. at 1446. This finding is not clearly erroneous.[11]
However, Fishing Vessel instructs us to give the Tribes a “fair share” and to “fairly apportion” the fish. Fishing Vessel, 443 U.S. at 682, 686, 99 S.Ct. 3055. With respect to the Growers’ shellfish beds, we conclude that it would contravene such notions of fairness if the Tribes were permitted to take fifty percent of the Growers’ enhanced harvest. Many of the Growers have spent decades developing and enhancing production on their shellfish beds, investing their valuable time, energy, and considerable resources. We therefore hold that only those Growers’ beds that exist solely by virtue of the natural propagation of the species are subject to a full fifty-percent harvest allocation. The other Grower beds will be subject to the allocation analysis below.
Our decision here is consistent with our previous decision in United. States v. Washington, 759 F.2d 1353, 1358-59 (9th Cir.1985) (en banc), where we concluded that hatchery fish are subject to Treaty allocation. In that decision, several “equitable considerations” favored the Tribes’ position, including “the lack of State ownership of the fish once released” and “the lack of any unjust enrichment of the Tribes.” Id.. Here, however, those same equitable considerations do not support the Tribes’ allocation of fifty percent of the Growers’ shellfish. First, unlike hatchery fish-whieh are replacement fish that are released into the water when grown-shellfish on the Growers’ beds remain on the Growers’ beds until they are harvested. Second, in the instant case, the Tribes would be unjustly enriched if they were entitled to a full fifty percent of the Growers’ shellfish. The Tribes candidly admitted as much at oral argument when they conceded that equity should permit a Grower to protect his enhanced harvest “for a couple of years.” We believe not for a couple of years, but forever.
Our conclusion squares with one of the purposes of the Proviso, which was “to protect the fledgling oyster industryf’s]” efforts to create a harvest where there was none, or where it was insufficient to support a commercial livelihood. Shellfish I, 873 F.Supp. at 1437-38; see also id. (“To the extent [the Proviso] prohibited Indians from taking shellfish from both artificial and natural shellfish beds where settlers were engaging in fruitful harvesting, [the Proviso] would aid the development of the industry.”). Moreover, the Tribes are not excluded from their *653 ancient fisheries; they are merely precluded from taking an unfair share.
We therefore apply the following analysis to Grower beds where the Growers, or their predecessors, began their enhancement efforts on a natural bed. For such natural beds, the Growers shall demonstrate what portion of their harvest is due to them labor, as opposed to what portion would exist absent the Growers’ enhancement. See Shellfish II., 898 F.Supp. at 1462. For such enhanced natural beds, the Tribes shall be entitled to fifty percent of the pre-enhanced sustainable shellfish production from those beds.[12] Of course, this allocation analysis does not apply to artificial beds, that is, to Grower beds that did not support a sustainable commercial density of shellfish prior to cultivation. As the Tribes have acknowledged, the Tribes have no right to harvest such beds. 898 F.Supp. at 1460-61.
We place the burden of proving pre-en-hancement harvest versus post-enhancement harvest on the Growers-for the Growers are best able to prove such a calculation.[13] We remand to the district court for a determination as to the best manner to implement this allocation. We emphasize that this “enhanced allocation” analysis applies only to the Commercial Shellfish Growers’ beds.
3. The district court erred by concluding that the State of Washington is “citizen.”
The district court determined that the term “citizens” in the Shellfish Proviso, “includes the State of Washington, when the State acts on behalf of the public.” Id. at 1459-60. The court noted that “the five million residents of the State are blameless in this controversy, and the Court believes that the benefits and efficiencies of permitting the State to act on their behalf in growing the State’s shellfish resource far outweigh any interest the tribes have in limiting the artificial bed exclusion to natural persons.” Id. n. 11. The court therefore concluded that “to the extent the State hereafter creates artificial shellfish beds on public property, those beds shall be deemed ‘staked or cultivated by citizens’ and thus excluded under the Shellfish Proviso from the Tribes’ Treaty right.” Id. Because the court once again improperly invoked equitable principles in its interpretation of the Treaty, and there is no support in the law for the proposition that a state can be a “citizen,” we reverse this aspect of the district court’s decision.
In the State of Washington’s brief and at oral argument, it was unable to cite a single case to support its proposition that a State can be “citizen.” We note that it took an act of Congress to enable a corporation to be considered a citizen for purposes of diversity jurisdiction. See 28 U.S.C. § 1332. We therefore reverse that portion of the district court’s decision which deems the State of Washington a “citizen” for purposes of the Shellfish Proviso.
4. The district court committed clear error in finding that 0.5 pounds of mature clams per square foot is the minimum density necessary to establish a natural bed.
In Shellfish II, the district court concluded that “in light of the practices and understandings in the shellfish industry that existed at treaty time, it is clear that a quantitative definition of a natural bed is appropriate.” 898 F.Supp. at 1461. The court defined a “natural shellfish bed” as a “bed capable of sustaining a yield of shellfish that will support, a commercial livelihood.” Id, The Tribes do not dispute these findings, but contend that the district court committed clear error when it found that the minimum quantity of manila clams that will support a commercial livelihood is 0.5 pounds of mature *654 clams per square foot. Manila clams are the only species for which the district court made such a finding. Because there is insufficient evidence in the record to support the district court’s finding, we conclude that the district court clearly erred.[14]
No witness gave an opinion as to the density of manila clams necessary for a successful commercial harvest. No document in the record sets forth any analysis of what density is necessary for commercial success. There is a document in the record which purports to show the densities of twelve manila clam beds leased from the State of Washington, but twelve beds is far too small and unrepresentative a sample of commercial beds to support a reliable finding of fact. See, e.g., National Lime Ass’n v. EPA, 627 F.2d 416, 434 n. 52 (D.C.Cir.1980) (recognizing problems with generalizing “from an extremely limited sample when a broader sample ... can be readily obtained and when no showing of the representativeness of the sample is made”) (citations omitted). Moreover, there is no indication that these bed samples included only mature clams in their density calculation. Significantly, two of the twelve beds appear to have densities of less than .26 pounds per square foot.
In light of the above, we reverse the district court’s finding that the minimum quantity of manila clams that will support a commercial livelihood is 0.5 pounds of mature clams per square foot. We remand to the district court for a new hearing on this issue.
5. The district court did not abuse its discretion by limiting the Tribes’ ability to cross private uplands.
The district court prohibited tribal access across privately owned upland property to reach shellfishing areas unless “specifically requested from and granted by a Special Master,” with permission to be refused unless “tribal members can demonstrate the absence of access by boat, publie road, or public right of way.”[15] Shellfish III, 909 F.Supp. at 793. The Tribes contend that this decision is “an unprecedented limitation on Tribes’ treaty fishing rights.”
The Supreme Court has already determined that the Tribes are entitled to a right of access aeross private lands to invoke their Treaty fishing rights. Winans, 198 U.S. at 383, 25 S.Ct. 662. Winans recognized that the Treaties “imposed a servitude upon every piece of land as though described therein.” Id at 381, 25 S.Ct. 662. Rather than completely eliminating the Tribes’ rights to cross private land, which it could not do under Winans, the district court engaged in a careful balancing of hardships in fashioning its remedy. Although we have held that the district court cannot use equitable principles in interpreting the Treaties, it can use them in deciding how to implement the-Treaties (i.e., how the tribes will be allowed to exercise their previously interpreted rights). Such a use of equities is permissible under the circumstances of this case. See Yankton, 272 U.S. at 357, 47 S.Ct. 142 (allowing monetary damages to Indians in lieu of ejectment of innocent land purchasers in order to avoid a “great injustice”).[16] We therefore conclude that the district court did not err by requiring the Tribes to prove the unavailability of other forms of access before allowing them to cross private land.
6. The district court did not abuse its discretion in imposing time, place, and manner restrictions on the Tribes’ ability to harvest shellfish.
The district court also invoked equitable principles to subject the Tribes’ Treaty shellfishing right to reasonable time, place and manner restrictions when the right is exercised on the Growers’ or Owners’ prop *655 erty. As discussed directly above, the time, place, and manner restrictions present a proper use of the court’s equitable powers.
The court imposed the following restrictions on the Tribes’ ability to harvest shellfish: 1) the Tribes’ harvest is limited to five days per year, with some increase on larger lots, for any private beach not controlled by a Grower, 898 F.Supp. at 1473; 2) if a Grower decides that a Tribe’s proposed harvest plan is not “compatible with the Growers’ farming operation,” the Grower may unilaterally modify the plan, and have “the final word on how a tribal harvest will be conducted,” id. at 1470; 3) the Grower may entirely prohibit harvest of natural clams underneath areas cultivated for oysters, even when no oysters are then present, id, at 1471; 4) no harvest may occur on non-Grower private tidelands without a survey “to determine the existence of shellfish populations,” id. at 1472; and 5) the “manner and method” of such a survey must be “of the type currently in use by the State.” Id,
Of particular concern to the Tribes is the restriction that allows the Growers to control access to natural clams by choosing not to harvest them in favor of the oysters under which the clams are found. The Tribes describe this restriction as a “gaping loophole” that has the capacity at the Growers’ discretion to deny to them the very rights to natural clams which our holding confirms.
The Growers counter with the argument from the record that the process of harvesting natural clams from underneath the oyster beds can seriously disrupt and suffocate their oysters.
On reflection, the Tribes’ concerns although certainly not fanciful-are based at this point on speculation as to what might happen in the future. The Growers, for example, represent that “where there are substantial economic benefits to a Grower from harvesting clams, the Grower will do so.” And, “[a]s soon as the Grower does, the trial court’s implementation plan provides that the Tribes have the right to a share of those clams.” The Growers say that they are “commercial farmers-if there is money to be made, the resource assuredly will be exploited.”
Under the circumstances, we believe that the district court’s restrictions do not amount at this time to an abuse of discretion. The district court attempted to fashion a prospective solution to a difficult situation by balancing the parties’ respective interests. The district court’s restrictions safeguard the Tribes’ right of access to the ancient fisheries, but also protect the interests of the Growers and Private Owners. Importantly, in this aspect of the court’s decision the court did not use equity as the basis for its interpretation of the decision, but only as a way to implement its correctly reasoned interpretation of the Proviso. While the Tribes may not be happy with the limits imposed on their harvesting, they are still able to effectuate their allocation under the Treaties and are not excluded from their ancient fisheries.
We are confident that any future practices by the Growers that trench inappropriately upon the Tribes’ rights as confirmed in this opinion will be adequately dealt with by the district court. The district court is the best place to manage any wrinkles that might crop up. The best way to avoid such problems, of course, is for the parties constructively to work together to respect each others’ rights.
We reject the Tribes’ contention that the restrictions are contrary to the Supreme Court’s decision in Puyallup Tribe v. Department of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968). Puyallup arose because a series of Washington state court decisions and state regulations imposed discriminatory restrictions on the Tribes. The Supreme Court held “the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.” Id. at 398, 88 S.Ct. 1725 (emphasis added). The Tribes cite no persuasive authority, however, to support the application of these standards to an implementation order promulgated by a Federal District Court. Puyallup applies to restrictions imposed “by the State," not the Federal Courts. The district court drafted the implementation order to interpret and to en *656 force the Tribes’ rights under the Treaties, not to restrict those rights. The motivation underlying the Court’s decision in PuyaMup-state discrimination against tribal fisheries-is simply not a factor when a district court imposes equitable restrictions of the type present in this case.
7. The district court’s procedures for selecting and disqualifying special masters deny due process.
Shellfish III established a panel of four special masters, with one to be randomly selected to hear each dispute. 909 F.Supp. at 793. The Tribes object to two aspects of the plan: 1) Appellants’ right to designate three of the four panel members; and 2) the designating parties’ ability to remove special masters at will and without court approval. The district court rejected the first objection outright, noting that the two parties to a dispute each have a twenty-five percent chance of having their own special master selected. The Tribes contend that Appellants have almost identical interests: therefore, the odds are 3-1 in Appellants’ favor. In fact, the district court made a finding that “each of the other parties is adverse to the Tribes, but not necessarily aligned with the others.” Shellfish III, 909 F.Supp. at 790. Given the district court’s finding that the Appellants are “adverse to the Tribes,” we conclude that due process is violated if there is a seventy-five percent chance that Appellants’ master will be selected. We therefore vacate this aspect of the implementation plan, and remand to the district court to reconfigure the appointment of Special Masters.
The Tribes also argue that allowing the parties to appoint and remove the master at will compromises the independence of the special master. Because the district court must approve the appointment of the Masters, see Shellfish III, 909 F.Supp. at 794, we find no merit in this argument.
8. The district court did not err in authorizing a special master to award damages against Tribal members.
The Tribes argue that Shellfish HI ⅛ provision allowing the special master to award damages against Tribal members is legally flawed. In addition, they contend that Shellfish II erroneously contains a provision allowing damages against the Tribes themselves. In Shellfish III, the district court amended its decision to preclude damage awards against the Tribes because Tribes cannot be sued without their unequivocal consent. See Oklahoma Tax Comm’n v. Potawatomi Indian Tribe, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). The district court, and the Tribes in their motion for reconsideration, apparently overlooked section 6.2 of Shellfish II ⅛ implementation order. Section 6.2 also allows special masters to award damages against the Tribes. We therefore vacate the portion of section 6.2 that allows for a special master to award damages against the Tribes. As set forth below, however, the special master can award damages against individual Tribal members.
The Tribes concede that individuals may be bound by orders affecting their “common public rights as citizens” in litigation to which their sovereign is a party. City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 341, 78 S.Ct. 1209, 2 L,Ed.2d 1345 (1958). A similar issue arose to Fishing Vessel, 443 U.S. at 692 n. 32, 99 S.Ct. 3055, where the Court concluded that non-party fishermen could be enjoined from actions interfering with the judgment of the district court. “[A] court clearly may order them to obey that judgment.” Id. The Tribes’ assertion that “the contemplated claims against tribal members have nothing to do with the common rights of state or tribal citizens” therefore is without merit. On the contrary, if tribal members damage private property while exercising their fishing rights, they directly implicate their sovereigns’. interests and the district court’s judgment.
Similarly, the Tribes’ argument that claims for trampled shrubs, damaged docks, or littered beaches “would raise no federal question” is also without merit. If the damages arise out of the exercise of fishing rights based on the district court’s interpretation of the Stevens Treaties, the district couiT has the authority to hear such a dispute. Moreover, the dispute would arise from the same “nucleus of operative facts,” affording the *657 court supplemental jurisdiction under 28 U.S.C. § 1367.
We therefore affirm the special master’s ability to recommend damages against individual Tribal members, but vacate section 6.2’s provision allowing damages against the Tribes.
9. The district court did not err in determining that the Tribes are not entitled to attorney’s fees.
The Tribes request attorney’s fees under 42 U.S.C. § 1988. The Tribes’ request is foreclosed by United States v. Washington, 813 F.2d 1020 (9th Cir.1987) (concluding Tribes not entitled to attorney’s fees in entire United States v. Washington series of litigation). We therefore affirm the district court’s denial of fees.
VII. CONCLUSION
For the reasons discussed above, we AFFIRM IN PART and REVERSE IN PART the district court’s decisions in Shellfish I, Shellfish II, and Shellfish III. We REMAND this case to the district court for proceedings consistent with this opinion. In so doing, we compliment the district court for the clarity of its opinions previously rendered.
We recognize the enormous impact our decision will have on the thousands of homeowners, Tribal members, and commercial fishermen in the Puget Sound region. It must be remembered that we are a court of limited jurisdiction. Moreover, we are bound by the Constitution’s Supremacy Clause which accords special standing to treaties. We do not have the power simply to “rewrite the Treaties or interpret the Treaties in a way contrary to settled law simply to avoid or minimize any hardship” to any of the parties in this case. Shellfish I, 873 F.Supp. at 1429. This case has come a long way since the 1970’s when a “total lack of meaningful communication” led to “deep distrust” between the parties. 384 F.Supp. at 329-30. The parties have apparently made sincere efforts to settle this dispute; we hope that our decision assists and renews that effort.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.
The parties shall bear their own costs of this appeal.

For example, if ten clams per square foot were a density sufficient to support a commercial livelihood at the time that enhancement began, and if a 100 square foot Grower's bed yielded ten clams per square foot prior to the Grower's efforts to enhance the output (1,000 clams), and that same bed now produces fifty clams per square foot as a result of the Grower’s labor (5,000 clams), the Tribes would be entitled to fifty percent of the 1,000 clams or 500 clams.

. The Tribes are the following: the Tulalip, Pu-yallup, Squaxin Island, Makáh, Muckleshoot, Upper Skagit, Nooksack, Nisqually, Lummi, Sko-komish, Port Gamble S'Klallam, Lower Elwha S’Klallam, Jamestown S'Klallam, Suquamish, Swinomish, Hoh, Stillaguamish, Sauk Suiattle, and Guileute. The Yakima Tribe, which participated in the proceedings below, did not appeal the district court's decision that the right to take shellfish is not reserved in its treaty with the United States.

. Each of the Tribes involved in this proceeding is the successor-in-interest to one or more of these treaties: Treaty of Medicine Greek, December 26, 1854, 10 Stat. 1132; Treaty of Point Elliott, January 22, 1855, 12 Stat. 927; Treaty of Point No Point, January 26, 1855, 12 Stat. 933; Treaty with the Makah, January 31, 1855, 12 Stat. 939; Treatv of Olympia, July 1, 1855, 12 Stat. 971.

. Anadromous fish are fish that migrate up rivers from the sea to breed in fresh water (i.e„ salmon).

. The other six cases are: United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); Seufert Bros. Co. v. United States, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555 (1919); Tulee v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942); Puyallup Tribe v. Department of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968); Department of Game v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973); Puyallup Tribe v. Department of Game, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). None of these cases involved interpretation of the Shellfish Proviso.

. The action was originally filed against only Washington. The following groups subsequently intervened in the proceeding; the Puget Sound Shellfish Growers, representing commercial shellfish growers; the Alexander group and Adkins group of private tideland owners; and a group of private property owners affiliated with the United Property Owners of Washington ("UPOW"). The district court denied motions to intervene filed by the Inner Sound Crab Association, Dungeness Crab Harvesters Association, and the Washington Harvest Divers Association. That ruling was recently affirmed by this Court. See United States v. Washington, 86 F.3d 1499 (9th Cir.1996).

. The State of Oregon has filed an amicus brief joining Washington in this argument.

. The court declared that only “those beds whose existence is entirely due to the natural propagation of the species” are subject to the Tribes' Treaty rights. This declaration excluded from Tribal harvest: 1) beds created from scratch; 2) beds enhanced by planting, netting or seeding pre-existing shellfish beds; 3) beds enhanced by using predator control or rototilling in or around preexisting beds; and 4) "beds whose existence is due to the Grower's efforts, albeit passively, such as the ‘natural’ migration of shellfish from an artificial bed to a new spot.” Shellfish II, 898 F.Supp. at 1462.

. The Imperial Irrigation District case provides little support for the Appellants. First, it is currently pending on appeal. Second, it: is stayed pending settlement discussions. See 799 F.Supp. at 1068.

. UPOW’s expert, Dr. Thomas, relied solely on what he called “tribal household income” and compared it to a moderate living standard by reference to the Bureau of the Census income data for non-Indian households. 873 F.Supp. at 1446. The district court concluded that this analysis was flawed because it relied only on income, making it a "single-indicator” analysis. Id.

. Even if we were to consider Tribal income from casino operations-as the Appellants ask us to do-we would not be left with a "definite and firm conviction” that the district court’s findings were erroneous.

. For example, if ten clams per square foot were a density sufficient to support a commercial livelihood at the time that enhancement began, and if a 100 square foot Grower’s bed yielded ten clams per square foot prior to the Grower's efforts to enhance the output (1,000 clams), and that same bed now produces fifty clams per square foot as a result of the Grower’s labor (5,000 clams), the Tribes would be entitled to fifty percent of the 1,000 clams or 500 clams.

. One way to do this would be to compare a Grower’s bed’s earliest shellfish production figures with the bed’s current output. This could serve as one of the bases by which to calculate the proper allocation amount.

. Because we conclude that the district court clearly erred, we do not address the Tribes' contention that they were unfairly surprised and unable to present evidence on this issue. On remand, the Tribes will have an opportunity to present such evidence.

. This decision amended the court’s decision in Shellfish II, which originally held that the Tribes had no right of private upland access at all. 989 F.Supp. at 1473.

.The Tribes and the United States also urge us to read into the absence of upland access showing a “reasonableness” requirement. We decline to do so, but we direct the district court, upon remand, to clarify its order with regard to this issue.