587 F.Supp. 1162 (1984)
UNITED STATES of America, Plaintiff,
v.
Gregory D. HICKS and Stevens J. Shale, Defendants.
No. CR82-332M.
United States District Court, W.D. Washington, at Seattle.
April 9, 1984.
*1163 Stephen J. Hyde, Aberdeen, Wash., for defendant Hicks.
T. Jeffrey Keane, Carney, Stephenson, Badley, Smith & Mueller, Seattle, Wash., for defendant Shale.
Gene S. Anderson, U.S. Atty., W.D. Wash., David V. Marshall, Asst. U.S. Atty., George D. Dysart, Sp. Asst. U.S. Atty., Seattle, Wash., F. Henry Habicht, II, Asst. Atty. Gen., James C. Kilbourne, Jean E. Williams, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., for plaintiff.

ORDER DENYING MOTION TO DISMISS AND REINSTATING THE CAUSE OF ACTION
McGOVERN, Chief Judge.

I. INTRODUCTION
On November 24, 1982, the United States filed an information charging the Defendants Gregory D. Hicks and Stevens J. Shale with killing one cow and two bull elk within the boundaries of Olympic National Park in violation of 16 U.S.C. § 256b. The killings occurred in the lower Queets Corridor, land following the course of the Queets River from where it leaves the "core" portion of the Park to where it enters the Quinault Indian Reservation. Defendants moved to dismiss, citing Article II of the Treaty of Olympia as a complete defense to the action.
On January 12, 1984, the Court entered an order adopting the Magistrate's Report and Recommendation and dismissing the information in this cause. Subsequently, the United States sought a rehearing. The Magistrate submitted a second report and recommendation to the Court to which the Government has filed objections.
The Court has reviewed memoranda filed by the parties concerning both the first and second report and recommendation of Magistrate Weinberg. Additionally, the Court has reviewed the amicus curiae brief of Alfred J. Schweppe, the distinguished and learned Seattle lawyer. Mr. Schweppe makes a cogent argument which might very well prove valid if it were necessary to the Court's decision. Because the Court has made its decision based on statutory interpretation, it does not reach the Constitutional issue presented by Mr. Schweppe.
For the reasons stated below, on reconsideration the Court concludes as follows:
1. The Treaty of Olympia, signed long before creation of Olympic National Park, secured the "privilege of hunting" to the Quinault Indians only so long as the lands were "open and unclaimed."
2. Upon the enactment by Congress of legislation creating the Olympic National Park (16 U.S.C. §§ 251, et seq.) in 1938, if not before, the land included therein ceased to be "open and unclaimed land," thus terminating the privilege of hunting on Olympic National Park lands.
3. The 1942 legislation, 16 U.S.C. § 256b, prohibiting all hunting in the Park, terminates the Indian hunting privilege on Olympic National Park lands.
4. Termination of the Indian hunting privilege on Olympic National Park lands does not constitute abrogation.

II. THE TREATY AND THE STATUTES
The Defendants' Motion to Dismiss is based upon Article III of the Treaty with the Qui-nai-elts (Quinault), also referred to as the Treaty of Olympia, 12 Stat. 971:
Article III. The right of taking fish at all usual and accustomed grounds and stations is secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the *1164 purposes of curing the same; together with the privilege of hunting, gathering roots and berries, and pasturing their horses on all open and unclaimed lands. [Emphasis added.]
Id. at 972.
In 1938, Congress created Olympic National Park by enactment of 16 U.S.C. §§ 251, et seq. The statute contemplates restricted use of the lands set aside:
§ 251. Lands dedicated; transfer of lands included in former Mount Olympus National Monument.
[These lands] are hereby reserved and withdrawn from settlement, occupancy, or disposal under the laws of the United States and dedicated and set apart as a public park for the benefit and enjoyment of the people and shall be known as Olympic National Park.
The effect on existing uses of the land at the time of the creation of the Park is described at 16 U.S.C. § 255:
§ 255. Effect on existing homestead, mineral, or other entries; addition of lands
Nothing herein contained shall affect any valid existing claim, location, or entry made under the land laws of the United States, whether for homestead, mineral, right-of-way, or any other purpose whatsoever, or shall affect the right of any such claimant, locator, or entryman to the full use and enjoyment of his land, nor the rights reserved by treaty to the Indians of any tribes.
In 1942, Congress prohibited hunting in the park by enacting 16 U.S.C. § 256b:
§ 256b. Rules and regulations; protection of wild birds or animals, fish, timber, minerals, and natural objects; penalties for violation
All hunting or the killing, wounding, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park [Olympic National Park], nor shall any fish be taken out of any of the waters of the park, except at such seasons and at such times and in such manner as may be directed by the Secretary of the Interior.

III. THE "PRIVILEGE OF HUNTING" TERMINATES UPON A CHANGE IN LAND STATUS.
The Treaty preserved the Indian fishery at the "usual and accustomed" places; it focused on the Indians traditional habits as to specific places. In contrast, hunting was not preserved in relation to the Indians' customary hunting grounds. Hunting was a use to which "all open and unclaimed lands" could be put. The construction to be given the hunting provision is elucidated by considering the purposes of the Treaty of Olympia and others with similar language.
The principal purposes of the treaties are described in United States v. Washington, 384 F.Supp. 312, 355 (W.D. Wash.1974):
The principal purposes of the treaties were to extinguish Indian claims to the land in Washington Territory and provide for peaceful and compatible coexistence of Indians and non-Indians in the area. The United States was concerned with forestalling friction between Indians and settlers and between settlers and the government. The Indians had received constant assurances from settlers and government representatives that they would be compensated for lands which were being settled by United States' citizens. Settlers had taken up land claims under the Donation Act even though the Indian rights had not yet been extinguished by treaties as required by the act creating the Oregon Territory.... Governor Stevens and the treaty commissioners were not authorized to grant to the Indians or treat away on behalf of the United States any governmental authority of the United States.
It follows perforce that as settlement by non-Indians occurred, lands upon which the Indians could exercise their hunting privilege would diminish. The hunting privilege *1165 is not an absolute right which when encroached is abrogated. The concept of abrogation does not apply to the Treaty hunting provision which by its terms is self-limiting. There was no representation in the Treaty that any areas would be retained as "open and unclaimed," or that any areas would be reserved from non-Indian use and occupancy. Thus, hunting may be characterized as a defeasible privilege giving way as the status of "open and unclaimed" land changes. Because the diminishment of "open and unclaimed" land was contemplated during the time the Treaty was signed, there can be no abrogation of the "privilege of hunting," although it may terminate on certain lands.

IV. THE MEANING OF OPEN AND UNCLAIMED LANDS
In the "Report and Recommendation on Motion to Dismiss," the Magistrate quotes the Idaho Supreme Court in State v. Arthur, 261 P.2d 135, 141 (1953), discussing the meaning of "open and unclaimed land":
It was intended to include and embrace such lands as were not settled and occupied by the whites under possessory rights or patent or otherwise appropriated to private ownership.... State v. Arthur, id. at 141.
This definition is fine as far as it goes, but it is not definitive and further analysis is required. The Government recognizes that very little land would be available for treaty hunting if it were confined only to land now available ("open") for claim and settlement under the public land entry laws. Rather, the Government argues that a construction must be given that includes publicly-owned lands that are open to hunting even though they may not be "open" under the public land laws. Such is the case with national forest lands which under Ninth Circuit case law are available for treaty hunting and grazing rights. Confederated Tribes of Umatilla Indian Res. v. Maison, 262 F.Supp. 871, 873 (D.C.Ore.1966), aff'd. sub nom Holcomb v. Confederated Tribes of Umatilla Indian Res., 382 F.2d 1013 (9th Cir.1967); Swim v. Bergland, 696 F.2d 712, 716-17 (9th Cir.1983).
The term "unclaimed" must have a greater meaning than that land only appropriated to private ownership. Otherwise, strict, neutral application of the term would have an alarming result. Large tracts of land taken by government entities for one or more special purposes inconsistent with hunting would necessarily be included as treaty hunting land. Federal wildlife sanctuaries, Point Defiance Park, Woodland Park, University campuses, military reservations, and other such land not in private ownership or use would be included. The Court notes that in the unpublished conclusions of law (copy attached to Government's objections filed Dec. 2, 1983) in Confederated Tribes of Umatilla Indian Res. v. Maison, the court contemplated that entities other than private persons could occupy land, thus removing it from the "unclaimed" status:
3. The national forest lands that are within the ceded area and other areas described in Finding 8 hereof, and all other public lands within said areas not actually occupied by private or public persons or corporations are "unclaimed lands" within the meeting [sic] of the Treaty of June 9, 1855 [12 Stat. 945]. At plaintiffs' request, it is not determined whether the presently established national wildlife refuges within said areas are such "unclaimed lands". [Emphasis added.]
The case dealt only with state regulation of Indian hunting on national forest lands, however, and did not define the nature of public occupation that would withdraw land from an "unclaimed" status within the treaty meaning for Indian hunting.
The construction of "open and unclaimed lands" that best accommodates Indian hunting as settlement occurs and matures is that "open and unclaimed lands" include public lands put to uses consistent with an Indian hunting privilege. Lands cease to be "open and unclaimed" when they are put to uses incompatible with hunting. This broad construction of "open and unclaimed lands" contemplates hunting among multiple uses with which it is compatible *1166 yet precludes it where it is not compatible.
The next question is whether the use for which the withdrawal of Olympic National Park lands was made is inconsistent with Indian hunting thus removing these lands from the "open and unclaimed" category.

V. OLYMPIC NATIONAL PARK LANDS ARE NOT "OPEN AND UNCLAIMED"
As described in 16 U.S.C. § 251, supra, the described lands were "reserved and withdrawn from settlement, occupancy, or disposal." These lands were no longer open for private settlement. The lands are preserved as a public park for the benefit and enjoyment of the people. The House Report accompanying the Bill that created Olympic National Park states:
The purpose of the proposed national park is to preserve for the benefit and enjoyment of the people the finest sample of primeval forest in the Pacific Northwest; to provide suitable range and permanent protection for the herds of native Roosevelt elk and other native wildlife; ....
H.R.Rep. No. 2658, 74th Cong., 2d Sess. 1 (1936) (emphasis added) (copy attached).
In a letter to the Committee on Public Lands seeking approval of the bill creating the Park, the then Secretary of the Interior, Harold L. Ickes, noted that the Park "would provide permanent protection of the last great remnant of the Roosevelt elk and sufficient winter range to maintain the species for posterity." H.R.Rep. No. 2658, at 3. Other congressional reports relating to the various bills which led to the eventual passage of the Olympic National Park Act contained similar specific recognition of the need to protect and preserve the Roosevelt elk and other wildlife. See, H.R. Rep. No. 1568, 75th Cong., 1st Sess. 1 (1937); H.R.Rep. No. 2247, 75th Cong., 3d Sess. 1-3 (1938); S.Rep. No. 2149, 75th Cong., 3d Sess. 2 (1938).
This Legislative history is unequivocal evidence that the Olympic National Park lands were withdrawn for a specific national use inconsistent with hunting and are no longer "open and unclaimed." In the face of population densification and urbanization, Congress recognized the value of preserving the splendor of forest tracts and their indigenous fauna for future generations.
The Olympic Peninsula in general has long been recognized as the habitat for the only native population of Roosevelt elk in the country. In 1909, President Theodore Roosevelt, in creating the Mount Olympus National Monument, the predecessor of Olympic National Park, noted that the areas within the Monument:
embrace certain objects of unusual scientific interest, including numerous glaciers, and the region which from time immemorial has formed the summer range and breeding grounds of the Olympic elk (cervus roosevelti), a species peculiar to these mountains and rapidly decreasing in numbers....

Proclamation of March 2, 1909, 35 Stat. 2247 (emphasis added) (copy attached). There is a detailed discussion of the status and distinction of the park lands and their importance to the national conservation scheme in the "Government's Memorandum in Opposition to Defendants' Memorandum on Treaty Rights," at pp. 2-6, incorporated by reference herein. (Attached for convenience.)
Because of the preservation purpose and the goal of permanently protecting the Roosevelt elk herds in creating Olympic National Park, the lands, although remaining wild and unsettled except for preexisting entries, were no longer "open and unclaimed" for hunting, within the meaning of the Treaty. The killing of a Roosevelt elk is an act inimical to its protection whether perpetrated by an Indian or a non-Indian. Hunting by any person is a use inconsistent with the purpose for which Olympic National Park was created.
Even if the foregoing analysis did not compel a conclusion that the Olympic National Park lands were withdrawn from the "open and unclaimed" category for Indian *1167 treaty hunting purposes, the enactment of 16 U.S.C. § 256b accomplished the withdrawal. Section 256b prohibits hunting and directs the Secretary of the Interior to provide such rules and regulations as necessary "for the protection of the animals and birds in the park from capture or destruction, and to prevent their being frightened or driven from the park." Section 256b unequivocally reinforces one of Olympic National Park's reasons for being that is incompatible with hunting. It is not logical to give the hunting privilege set forth in the treaty superior force in the face of the purpose for the creation of Olympic National Park when it was contemplated by the parties to the Treaty that settlement of the northwest would occur and hunting lands would diminish.
It must be noted that fishing was treated differently in the Park. The Secretary of the Interior was to "make rules and regulations governing the taking of fish from the waters in the park" during certain seasons and times. 16 U.S.C. § 256b. Thus, Indians remain free to take fish from their "usual and accustomed" places within the Park's boundaries.
It must also be noted that national forests are to be distinguished from national parks. 16 U.S.C.S. § 475 provides the "purposes for which national forests may be established and administered [:] ... to improve and protect the forest within the reservation [national forest] or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States...." In a letter to the Committee on Public Lands seeking approval of the bill creating the Park, the then Secretary of the Interior, Harold L. Ickes, explained the differences between a national forest and a national park:
The differences between a national forest and a national park are distinct and tangible. In a national forest the timber may be sold to private companies; grazing rights may be sold to private stock owners; rivers and lakes may be dammed for private power developments; and choice scenic spots may be leased for private homes. These are only a few of the legitimate practices of forestry, in addition to which there are the hunting and trapping of the native wildlife. Such practices are all in the nature of private and individual privilege, as opposed to the general, public use. These practices are not compatible with national parks, and that is just the crux of the difference.

H.R.Rep. No. 2658, 74th Cong., 2d Sess. 4 (1936), (emphasis added) (copy attached).

VI. CONCLUSION
The "privilege of hunting" set forth in the Treaty of Olympia is not an absolute right which when encroached requires specific abrogation; the concept of abrogation is inapplicable because of the Treaty's self-limiting terms. The circumstances surrounding the negotiation of the Treaty, together with the Treaty language itself describing the lands available for Indian hunting, compel a conclusion that the lands available for Indian hunting would change with the times. Homesteading as well as other kinds of settlement inimical to hunting were destined to occur and were contemplated at the time of the Treaty's negotiations. A withdrawal of lands to preserve its natural beauty and indigenous wildlife is one example of a use that is incompatible with all hunting. The explicit language contained in the legislative history to the creation of Olympic National Park supports this view. For these reasons, the Court concludes that Olympic National Park lands are not "open and unclaimed" and that the Treaty "privilege of hunting" is precluded within the Park's boundaries. Accordingly,
IT IS ORDERED ADJUDGED AND DECREED that the Court's earlier order adopting the Report and Recommendation and dismissing the information herein is vacated, Defendant's Motion to Dismiss is DENIED, and this matter shall be set for trial.

*1168 APPENDIX
 *1169 *1170 *1171 *1172 *1173 *1174 *1175 *1176 *1177 *1178 *1179 *1180 *1181

*1182 GOVERNMENT'S MEMORANDUM IN OPPOSITION

II. BACKGROUND
The Olympic Peninsula in northwestern Washington has long been recognized as an outstanding ecological environment, containing rainforests with centuries-old stands of virgin trees and the only native population of Roosevelt elk in the country. The history of the peninsula in the Twentieth Century has been one of a long struggle to provide permanent protection for the area in order to preserve the old growth forests and the elk that inhabit them from total destruction.
In the early 1900's, the Roosevelt elk on the Olympic Peninsula were being hunted excessively for their valuable canine teeth, or "ivories," and many of those populations had become decimated. K. Jenkins, Status of Elk Populations and Lowland Habitat in Western Olympic National Park 1 (National Park Service 1981). Public outcry about the depleted elk populations resulted in a ban on hunting in 1905 (id.). In 1909, President Theodore Roosevelt took further steps to preserve the unique environment of the Olympic Peninsula when, acting pursuant to the Antiquities Act, 16 U.S.C. 431-433,[1] he created Mount Olympus National Monument. Proclamation of March 2, 1909, 35 Stat. 2247. The President's proclamation found the area worthy of national monument status for two reasons: the region contained many objects of unusual scientific interest; and it had "from time immemorial ... formed the summer range and breeding grounds of the Roosevelt elk (id.). President Roosevelt noted that those elk were "peculiar to [the Olympic] mountains" and that their number was "rapidly decreasing" (id.).[2]
The United States Forest Service assumed jurisdiction over Mount Olympus National Monument and administered it until 1933. During that time, the monument was reduced to about one-half of its original acreage by three successive Presidential proclamations,[3] thereby allowing timber to be harvested on the lopped-off portions. On June 10, 1933, President Franklin Roosevelt transferred jurisdiction over the Monument to the National Park Service. Exec. Order No. 6166.
Starting in 1936, Congress made several attempts to enlarge Mount Olympus National Monument and to give it national park status. Conservationists were concerned because the Monument did not contain the finest examples of the rainforests on the Olympic Peninsula nor did it include the winter range of the Roosevelt Elk. H.R.Rep. No. 2658, supra, at 1.[4] In 1936, extensive hearings were held in H.R. 7086, which would have created a national park two and one-half times the size of the original Monument.[5] Major opposition to the bill came from the timber industry, which *1183 was concerned that inclusion of so much forest land within the proposed park would have a devastating impact on the local economy. See, supra, n. 5.
In 1938, Congress overcame this opposition and enacted H.R. 10024, which abolished Mount Olympus National Monument and created in its place Olympic National Park, approximately 648,000 acres in the size. Act of June 29, 1938, 52 Stat. 1241, codified at 16 U.S.C. 251-255. The Act authorized the President to add additional lands to the park by proclamation, but provided that the total area included within the park should not exceed 892,292 acres. 52 Stat. 1242. President Franklin Roosevelt added 187,400 acres to the park in 1940, Proclamation of January 2, 1940, 54 Stat. 2678, and President Harry Truman added 47,700 acres in 1953. Proclamation of January 6, 1953, 67 Stat. C27. These two proclamations added, respectively, the middle and lower portions of the Queets Corridor, a strip of land following the course of the Queets River from where it leaves the "core" portion of the park to where it enters the Quinault Indian Reservation, a point about four miles from the Pacific Ocean.[6]
The unique wonders of Olympic National Park continue to be recognized as deserving protection. In 1977, the United Nations Educational, Scientific, and Cultural Organization (UNESCO) certified ONP as a Biosphere Reserve. These Reserves consist of protected samples of the world's major ecosystem types which are devoted to conservation of nature and to scientific research. The Reserves provide a standard against which the effect of man's impact upon his environment may be measured. National Park Service News Release (May 18, 1977) (see Attachment A). More recently, in 1981, ONP was added to the World Heritage List. This List is maintained by the International Union for Conservation of Nature and Natural Resources, a group established under a 1972 international convention which recognizes and provides protection to natural and cultural properties that are considered to be irreplaceable treasures of outstanding value. Department of the Interior News Release (December 11, 1981)
NOTES
[1] The Antiquities Act authorized the President to declare "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" situated on lands owned or controlled by the United States to be national monuments and to reserve those lands from settlement, entry, location or claim under the public land laws. 16 U.S.C. 431.
[2] The National Monument, which was 298,730 acres large or approximately one-third the size of the current-day park, centered around Mount Olympus. 35 Stat. 2247; H.R.Rep. No. 2658, 74th Cong; 2d Sess. 1 (1936).
[3] Proclamation of April 17, 1912, 37 Stat. 1737; Proclamation of May 11, 1915, 39 Stat. 1726; Proclamation of January 7, 1929, 45 Stat. 2984.
[4] The original monument contained only the summer range of the elk. See Proclamation of March 2, 1909, 35 Stat. 2247.
[5] Hearings Before the House of Representatives Committee on Public Lands, 74th Cong., 2d Sess., on H.R. 7086 (April 23, 24, 25, 27, 28, 29, 30, May 1 and 5, 1936.
[6] The hunting incident at issue here occurred on land within the lower Queets Corridor. The United States condemned this land, which had been in private ownership, in June 1940, and the 1953 Proclamation included it within ONP.