[No. 66054-9. En Banc.]
Argued November 18, 1998. Decided June 17, 1999.
THE STATE OF WASHINGTON, *Petitioner*, v. DONALD RAY BUCHANAN, *Respondent*.

188

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Kenneth L. Ramm* and *Lauri M. Boyd, Deputies,* for petitioner.

*Law Offices of David S. Vogel,* by *David S. Vogel,* for respondent.

*Kevin R. Lyon* and *Ronald J. Whitener* on behalf of Squaxin Island Tribe; *Mason D. Morissett* on behalf of Tu-

lalip Tribes; *Bill Tobin* on behalf of Nisqually Indian Tribe; *Phillip E. Katzen* and *Allen H. Sanders* on behalf of Sauk-Suiattle Tribe and Stillaguamish Tribe; *Kathryn J. Nelson* on behalf of Port Gamble S'Klallam, Jamestown S'Klallam, Lower Elwha S'Klallam, and Skokomish Tribe; *Debra S. O'Gara* on behalf of Puyallup Tribe; *Harold Chesnin* on behalf of Upper Skagit Tribe; *Daniel A. Raas* on behalf of Lummi Tribe; *Alix Foster* and *Allan E. Olson* on behalf of Swinomish Indian Tribal Community; *John C. Sledd* on behalf of Suquamish Indian Tribe; *Elizabeth F.M. Nason* on behalf of Bands of Yakama Indian Nation; *Jeffrey J. Bode* on behalf of Nooksack Tribe; and *Robert L. Otsea, Jr.*, and *Alan C. Stay* on behalf of Muckleshoot Indian Tribe, amici curiae.

*Christine O. Gregoire, Attorney General*, and *Robert K. Costello, Assistant*, on behalf of Department of Fish and Wildlife, amicus curiae.

*Joseph L. Coniff, Jr.*, on behalf of Modern Firearm Hunters of Washington, amicus curiae.

*Ralph W. Johnson*, amicus curiae.

GUY, C.J. — This is a criminal prosecution for illegal hunting of elk in the State-owned Oak Creek Wildlife Area. The defendant, a member of the Nooksack Indian Tribe, claims he has a treaty right to hunt elk in the Oak Creek Area, and that this right may not be restricted by state hunting regulations. The issues presented are (1) whether

the geographic scope of the tribe's treaty right to hunt on open and unclaimed lands includes the Oak Creek Wildlife Area, (2) whether the Oak Creek Wildlife Area is open and unclaimed land, and (3) whether the tribe's treaty right to hunt outside the reservation was abrogated by Washington's admission to the Union "on equal footing" with the original states.

We reverse the dismissal of the criminal action and remand for trial. We hold that, on remand, the defendant may raise a treaty right to hunt as a defense to the criminal charges and may offer evidence in support of his position that the Oak Creek Wildlife Area is within the aboriginal hunting grounds of the Nooksack Tribe. We also hold that under the facts presented in this case, the Oak Creek Wildlife Area is "open and unclaimed" land within the meaning of the Nooksack's treaty. We decline, in this case, to reconsider prior case law on whether the equal footing doctrine applies to impliedly abrogate Indian treaty rights in Washington.

## FACTS

On January 6, 1995, defendant Donald Buchanan was stopped by Department of Fish and Wildlife enforcement officers while Buchanan was hunting in the Oak Creek Wildlife Area, land which is owned and managed by the State of Washington. The defendant was in possession of two recently killed five-point, branch-antlered bull elks. At the time he was stopped, the defendant's Washington state hunting license had been revoked, and the Washington elk hunting season was closed.

The Oak Creek Wildlife Area, which is near Yakima, is open to the public at specified times each year for hunting, fishing and recreational purposes. During the fall and winter of 1994-95, state regulations permitted elk hunting in the Oak Creek Wildlife Area only from November 5 through 13, 1994. The number of branch-antlered elk that could be killed also was regulated during the hunting

season, and only young "spike bulls" could be killed without a special permit. The purposes of the restrictions on elk hunting in the Oak Creek Wildlife Area are to maintain and manage the existing elk population. However, there is not an immediate threat to elk, as a species, in the Oak Creek Wildlife Area.

Defendant Buchanan is a resident of Kent, Washington, and a member of the Nooksack Indian Tribe. At the time he was stopped by Wildlife enforcement officers, he possessed both a Nooksack Tribe identification card and hunting tags issued by the Tribe. The Nooksack Tribe's reservation is located in Whatcom County, near Deming. The lands ceded to the United States by the Nooksack Tribe under the provisions of the Treaty of Point Elliott,[1] which is the treaty involved here, are bordered on the east by the summit of the Cascade range. The Oak Creek Wildlife Area is east of the territory ceded to the United States by the Nooksacks.

Defendant Buchanan was charged with two felony counts of possessing big game during a closed season, former RCW 77.16.020(1)(E), former RCW 77.21.010(1) (second or subsequent violation), and with one misdemeanor count of hunting while license is revoked. Former RCW 77.21-.060(2).[2]

Defendant Buchanan moved to dismiss the charges on the ground that State hunting regulations do not apply to

---

[1]Treaty Between the United States and the Dwamish, Suquamish, and other allied and subordinate Tribes of Indians in Washington Territory, Jan. 22, 1855, 12 Stat. 927.

[2]Former RCW 77.16.020(1) provided in pertinent part: "It is unlawful to hunt, fish, possess, or control a species of game bird, game animal, or game fish during the closed season for that species." Laws of 1987, ch. 506, § 59. Former RCW 77.21.010(1) provided that a subsequent violation of the hunting laws must be prosecuted and punished as a Class C felony. Laws of 1988, ch. 265, § 3. Former RCW 77.21.060(2) provided, in pertinent part, that it was "unlawful for a person to conduct an activity requiring a wildlife license, tag, or stamp for which they have had a license forfeiture[.]" Laws of 1989, ch. 314, § 6. In 1998 the Legislature revised and recodified the criminal laws governing the taking of fish and wildlife. Laws of 1998, ch. 190. The prohibitions and penalties have not changed. See RCW 77.15.410 (unlawful hunting of big game); RCW 77.15.670 (unlawful hunting while hunting privileges revoked).

hunters, like Buchanan, who are members of Indian tribes that have a treaty right to hunt on open and unclaimed lands. He claims the only regulations that govern his hunting on open and unclaimed lands are those of the Nooksack Indian Tribe.

The trial court granted the motion to dismiss the charges, ruling: (1) the language of the Treaty of Point Elliott does not restrict hunting to open and unclaimed lands within the area ceded by the Indians to the United States, but instead gives tribal members a right to hunt anywhere in the "Territory of Washington"; (2) the term "open and unclaimed lands" includes public lands, such as the Oak Creek Wildlife Area, which are put to uses compatible with an Indian hunting privilege; and (3) although Indian hunting privileges may be limited if necessary for conservation, the State, in this case, failed to demonstrate that application of State hunting regulations to treaty tribe hunters is necessary for conservation.

On appeal, the State challenged the trial court's conclusions and, additionally, argued that the Treaty of Point Elliott was abrogated by Congress when Washington was admitted to the Union on equal footing with the original states. The Court of Appeals affirmed and declined to consider the equal footing argument, as that issue was not presented to the trial court and was not asserted to be of constitutional magnitude. *State v. Buchanan*, 87 Wn. App. 189, 196, 941 P.2d 683 (1997), *review granted*, 134 Wn.2d 1012 (1998). This court granted the State's petition for review.

Several treaty tribes, including the Nooksack Tribe, have filed an amicus brief providing an overview of tribal management of off-reservation hunting by tribal members, a description of cooperative agreements governing wildlife management between tribes and between various tribes and the State, and further setting forth the tribes' position

on the meaning of "open and unclaimed" lands.[3] Professor Ralph Johnson of the University of Washington School of Law has filed an amicus brief on the proper interpretation of the treaty language "open and unclaimed" lands. An amicus brief has been filed by the Department of Fish and Wildlife on the issues of the geographical scope of the treaty right involved and on the designation of the Oak Creek Wildlife Area as open and unclaimed lands during the winter months. Modern Firearm Hunters of Washington has filed an amicus brief in support of the State's equal footing argument.

Prior to oral argument in this court, the State filed a motion captioned, "Request for Judicial Notice or to Supplement the Record Under RAP 9.11." In its motion the State argues that defendant Buchanan should not be permitted to raise the defense that he has a treaty right to hunt because the Nooksack Tribe was not a signatory to the Treaty of Point Elliott. Defendant Buchanan responded to the motion and, additionally, moved for sanctions against the State, arguing the motion was frivolous and made for purposes of delay. Both motions were passed to the merits.

## ISSUES

1. What is the geographic scope of the Nooksack Indian Tribe's treaty hunting right?

2. Is the State-owned Oak Creek Wildlife Area "open and unclaimed lands" within the meaning of the Treaty of Point Elliott?

3. Were those provisions of the Treaty of Point Elliott which conflict with the State's right to regulate off-reservation hunting abrogated by Congress when Washing-

---

[3]The tribes joining in the amicus brief are the Squaxin Island Tribe, Tulalip Tribes, Nisqually Indian Tribe, Port Gamble, Jamestown and Lower Elwha Bands of S'Klallam, and Skokomish Tribe, Puyallup Tribe, Upper Skagit Tribe, Sauk-Suiattle Tribe, Stillaguamish Tribes, Swinomish Indian Tribal Community, Suquamish Tribe, Yakama Indian Nation, Lummi Tribe, Nooksack Tribe, and Muckleshoot Indian Tribe.

ton was admitted to the Union upon "equal footing" with the original states?

## DISCUSSION

We begin by denying both the State's motion for judicial notice or to supplement the record and the defendant's motion for sanctions.

In its motion, the State first argues that this court should take judicial notice that the court lacks "subject matter jurisdiction" over defendant Buchanan's defense because the Nooksack Tribe was not a signatory to the Treaty of Point Elliott, and Buchanan, therefore, has no treaty hunting rights.

■■ The State's motion raises a new issue—that is, whether defendant Buchanan failed to prove a necessary element (the existence of a treaty) of his defense. The court generally will not consider issues which are not set forth in the petition for review, RAP 13.7(b), nor arguments raised for the first time on appeal. *See, e.g., Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992). However, this rule does not apply when the issue raised affects the right to maintain an action. *Jones v. Stebbins*, 122 Wn.2d 471, 479, 860 P.2d 1009 (1993). In this case, the State claims that defendant Buchanan does not have a right to maintain his defense and, therefore, the court should take judicial notice that it is without jurisdiction to consider it.

The issue raised by the State does not present a jurisdictional question. Jurisdiction is the power of the court to hear and determine the class of action to which a case belongs. *State v. Werner*, 129 Wn.2d 485, 493, 918 P.2d 916 (1996); *Bour v. Johnson*, 80 Wn. App. 643, 647, 910 P.2d 548 (1996). This is a criminal felony action brought by the State. The trial court had authority to determine the legal and factual issues involved. RCW 2.08.010; *Werner*, 129 Wn.2d at 493. This court has the power to determine the appeal. RCW 2.04.010.

■ Alternatively, the State asks to supplement the

record with documents showing that the Nooksack Indian Tribe has previously taken the position that it was not a party to the treaty. This issue was resolved in 1978 in an action in which the State of Washington was a defendant, and in which the trial court ruled that the Nooksack Indian Tribe was included in the Treaty of Point Elliott. *United States v. Washington*, 459 F. Supp. 1020, 1040-41 (W.D. Wash. 1978) (posttrial substantive orders following the initial Boldt decision),[4] *aff'd*, 645 F.2d 749 (9th Cir. 1981) (the appeal does not challenge the trial court's ruling relating to the Nooksack's status as a treaty tribe).

The State argues that this court need not consider the federal court decision because it is "a lower federal court case which is non-binding precedent on this court." Req. for Judicial Notice at 6. However, the State was a party to the federal court case and is bound by its ruling. *Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 953, 603 P.2d 819 (1979) (all parties, and all those who are in privity with parties, must comply with the federal court orders entered in *United States v. Washington*). *See also Nielson v. Spanaway Gen. Med. Clinic, Inc.*, 135 Wn.2d 255, 262, 956 P.2d 312 (1998) (the doctrine of collateral estoppel prevents relitigation of an issue, in state court, after the party against whom the doctrine is applied has had a full and fair opportunity to litigate his or her case in federal court). The State claims the federal trial court's decision on the issue is erroneous, but it did not appeal the trial court's findings and conclusion with respect to the Nooksack Tribe. Recourse from an erroneous federal court decision is through the federal system. *Puget Sound Gillnetters*, 92 Wn.2d at 952. Accordingly, we deny the motion to supplement.

Although we deny the State's motion, we decline to

---

[4]The first of the so-called "Boldt decisions" is set forth in *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974). The underlying litigation and the Boldt decision orders have been the subject of numerous actions in both Washington and federal courts. *Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 603 P.2d 819 (1979), traces the history of the litigation through 1979.

impose sanctions against it. We are satisfied that the motion was filed in good faith.

We turn now to the substantive issues in this appeal.

Defendant Buchanan's defense to the criminal charges brought against him is that he is not subject to State hunting laws because he has a treaty right to hunt on any open and unclaimed lands in "Washington Territory," and that this treaty right is superior to the right of the State to regulate hunting.

The State makes essentially three arguments. First, it argues that any treaty hunting right that exists in the Nooksack Tribe should be interpreted to permit hunting only on open and unclaimed land within the area ceded to the United States by the tribe, or upon land which the tribe has traditionally hunted. Second, the State argues that even if the treaty affords a right to hunt outside the ceded area, the Oak Creek Wildlife Area is not "open and unclaimed" land. Finally, it urges this court to hold that no treaty right to hunt or fish in violation of State regulations survived Washington's admission to the Union on "equal footing" with the original states.

Our initial inquiry is to determine the geographic scope of the Nooksack Tribe's treaty hunting right.

In 1854 and 1855 Isaac Stevens, who was the first Governor and Superintendent of Indian Affairs for Washington Territory, negotiated several treaties between the United States and the various tribes and bands of Indians who lived in the Territory.[5] *See generally United States v. Washington*, 384 F. Supp. 312, 353-57 (W.D. Wash. 1974); *Seufert Bros. Co. v. United States*, 249 U.S. 194, 39 S. Ct. 203, 63 L. Ed. 555 (1919).

At the time the treaties were negotiated, approximately three-fourths of Western Washington's 10,000 or so inhabitants were Indians. *Washington v. Washington State Com-*

---

[5]In addition to what is now Washington State, Washington Territory included parts of Idaho and Montana. *See* Charles F. Wilkinson, *Indian Tribal Rights and the National Forests: The Case of the Aboriginal Lands of the Nez Perce Tribe*, 34 IDAHO L. REV. 435, 436-37 (1998).

*mercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 664, 99 S. Ct. 3055, 61 L. Ed. 2d 823 (1979) (hereafter *Fishing Vessel*). The natural resources appeared to the parties to be inexhaustible. *Fishing Vessel*, 443 U.S. at 669.

In the treaties, the Indians relinquished their interest in most of the Territory in exchange for monetary payments. Additionally, certain relatively small parcels of land were reserved for the exclusive use of particular tribes or bands, and the Indians were afforded other guarantees, such as certain rights of fishing and hunting. *Fishing Vessel*, 443 U.S. at 662.

The Treaty of Point Elliott was made in January 1855 and ratified March 8, 1859. As noted above, the Nooksack Indian Tribe was judicially determined to be a party to the treaty in *United States v. Washington*, 459 F. Supp. 1020. The first article of the treaty includes a description of lands ceded to the United States by the Indians. The treaty provides, in article 1, that the "said tribes and bands of Indians hereby cede, relinquish, and convey to the United States all their right, title, and interest in and to the lands and country occupied by them, bounded and described as follows: Commencing at [the inlets and bays of western Washington Territory] to the summit of the Cascade range of mountains." Treaty of Point Elliott at 927.

Article 5 of the treaty provides:

> The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and un-claimed lands. Provided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens.

Treaty of Point Elliott at 928.

This paragraph was substantially the same in all of the

Stevens' Treaties,[6] and its language has been the subject of extensive litigation in both state and federal court during much of the last century. *See, e.g., United States v. Winans,* 198 U.S. 371, 25 S. Ct. 662, 49 L. Ed 1089 (1905); *Seufert Bros.,* 249 U.S. 194; *Tulee v. Washington,* 315 U.S. 681, 62 S. Ct. 862, 86 L. Ed. 1115 (1942); *State v. Towessnute,* 89 Wash. 478, 154 P. 805 (1916); *State v. Wallahee,* 143 Wash. 117, 255 P. 94 (1927); *State v. McCoy,* 63 Wn.2d 421, 387 P.2d 942 (1963); *State v. Chambers,* 81 Wn.2d 929, 506 P.2d 311 (1973); *State v. Petit,* 88 Wn.2d 267, 558 P.2d 796 (1977); *State v. Miller,* 102 Wn.2d 678, 689 P.2d 81 (1984); *Atwood v. Shanks,* 91 Wn. App. 404, 958 P.2d 332 (1998); *United States v. Alaska Packers' Ass'n,* 79 F. 152 (N.D. Wash. 1897); *United States v. Hicks,* 587 F. Supp. 1162 (W.D. Wash. 1984); *United States v. Washington,* 384 F. Supp. 312; *United States v. Washington,* 157 F.3d 630 (9th Cir. 1998); *State v. Arthur,* 74 Idaho 251, 261 P.2d 135 (1953). *See also* Charles F. Wilkinson, *Indian Tribal Rights and the National Forests: The Case of the Aboriginal Lands of the Nez Perce Tribe,* 34 IDAHO L. REV. 435, at 447-48 (1998); Dana Johnson, *Native American Treaty Rights to Scarce Natural Resources,* 43 U.C.L.A. L. REV. 547, 552 (1995); Bradley I. Nye, *Where Do the Buffalo Roam? Determining the Scope of American Indian Off-Reservation Hunting Rights in the*

---

[6]In some of the treaties the language with respect to shellfish is omitted. *See, e.g.,* Treaty Between the United States and the Walla-Walla, Cayuses, and Umatilla Tribes and Bands of Indians in Washington and Oregon Territories, June 9, 1855, art. I, 12 Stat. 945, 946 (hereinafter Treaty Between the Walla-Wallas); Treaty Between the United States and the Yakama Nation of Indians, June 9, 1855, art. III, para. 2, 12 Stat. 951, 953 (hereinafter Treaty Between the Yakamas); Treaty Between the United States and the Nez Percé Indians, June 11, 1855, art. III, para. 2, 12 Stat. 957, 958 (hereinafter Treaty Between the Nez Percé); Treaty Between the United States and the Flathead, Kootenay and Upper Pend d'Oreilles Indians, July 16, 1855, art. III, para. 2, 12 Stat. 975, 976 (hereinafter Treaty Between the Flatheads). In some the privilege to hunt and gather roots and berries also includes the right to pasture cattle and horses on open and unclaimed land. *See, e.g.,* Treaty Between the Walla-Wallas, 12 Stat. at 946; Treaty Between the Yakamas, 12 Stat. at 953; Treaty Between the Nez Percé, 12 Stat. at 958; Treaty Between the United States and the Qui-nai-elt and Quil-leh-ute Indians, Jan. 25, 1856, art. III, 12 Stat. 971, 972; Treaty Between the Flatheads, 12 Stat. at 976. The Treaty between the United States and the Makah Tribe also secures to the tribe the right of whaling or sealing at usual and accustomed grounds. Treaty Between the United States and the Makah Tribe of Indians, Jan. 31, 1855, art. IV, 12 Stat. 939, 940.

*Pacific Northwest*, 67 Wash. L. Rev. 175 (1992); Laurie Reynolds, *Indian Hunting and Fishing Rights: The Role of Tribal Sovereignty and Preemption*, 62 N.C. L. Rev. 743 (1984).

These authorities and others provide a framework for judicial examination of the treaty language involved here.

■ Like any treaty between the United States and another sovereign nation, a treaty with Indians is the supreme law of the land and is binding on the State until Congress limits or abrogates the treaty. U.S. Const. art. VI; *Antoine v. Washington*, 420 U.S. 194, 201, 95 S. Ct. 944, 43 L. Ed. 2d 129 (1975); *State v. McCormack*, 117 Wn.2d 141, 143, 812 P.2d 483 (1991).

■■ A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereigns. *Fishing Vessel*, 443 U.S. at 675; *State v. Courville*, 36 Wn. App. 615, 619, 676 P.2d 1011 (1983). When the signatory nations are not at war and neither is the vanquished, it is reasonable to assume the parties bargained at arm's length. *Fishing Vessel*, 443 U.S. at 675. In discussing the negotiations involved in another Stevens' Treaty, that with the Nez Perce, Professor Wilkinson states:

> [T]he stereotype of Indian leaders at treaty talks as being passive and overmatched intellectually is wrong.
>
> The negotiators for the Nez Perce, and for the other tribes as well, had a complete understanding of the situation. The white people wanted their land, and had the population and technology to take it. The tribes, on the other hand, had considerable leverage: in time they would lose a military campaign, but they could exact great costs in terms of human life and monetary expenditures to fight a war on the fragile, far edge of American territory.
>
> The calculus was about power, and the tribes could make the calculations as well as the white people. The tribal negotiators were sophisticated and they used every technique and device available to them. . . . They made their arguments precisely and ably.

Wilkinson, *supra*, at 438 (footnotes omitted).

The goal of treaty interpretation is the same as the goal of contract interpretation—to determine the intent of the parties. *Fishing Vessel*, 443 U.S. at 675; *United States v. Washington*, 157 F.3d at 642. The analysis of the parties' intention begins with the language of the treaty and the context in which the written words are used. *United States v. Washington*, 157 F.3d at 642. In interpreting a treaty between the United States and an Indian tribe, the treaty must " 'be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.' " *Fishing Vessel*, 443 U.S. at 676 (quoting *Jones v. Meehan*, 175 U.S. 1, 11, 20 S. Ct. 1, 5, 44 L. Ed. 49 (1899)); *Miller*, 102 Wn.2d at 683.

Where there is ambiguity in the language of a treaty, it must not be construed to the prejudice of the Indians. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 119 S. Ct. 1187, 143 L. Ed. 2d 270 (1999); *Antoine*, 420 U.S. at 199; *Miller*, 102 Wn.2d at 683. However, courts may not ignore treaty language that, viewed in its historical context and given a fair appraisal, clearly runs counter to the tribe's claims. *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774, 105 S. Ct. 3420, 87 L. Ed. 2d 542 (1985); *Department of Ecology v. Yakima Reservation Irrigation Dist.*, 121 Wn.2d 257, 277, 850 P.2d 1306 (1993). Additionally, treaties must be construed liberally in favor of Indians. *Ecology*, 121 Wn.2d at 277; *State v. Price*, 87 Wn. App. 424, 429, 942 P.2d 377 (1997).

A key principle of treaty interpretation is known as the "reservation of rights doctrine." First announced in *United States v. Winans*, 198 U.S. 371, a case involving interpretation of a Stevens' Treaty made with the Yakama Indians,[7] the reservation of rights doctrine holds that a treaty between the federal government and an Indian tribe

---

[7]In 1994, the Yakima Indian Nation adopted the spelling of Yakama. *See State v. Price*, 87 Wn. App. 424, 425 n.1, 942 P.2d 377 (1997). This spelling is used throughout this opinion when referring to the Yakama Nation, except where the spelling "Yakima" appears in the title of an article or case.

is not a grant of rights to the Indians but, rather, a grant from them. In other words, the Indians ceded certain rights possessed by them at the time of making the treaty but reserved whatever rights were not expressly granted to the United States. *Winans*, 198 U.S. at 381. *See also Seufert Bros.*, 249 U.S. at 199; *Fishing Vessel*, 443 U.S. at 679-81; Wilkinson, *supra*, at 454-55.

Under the reservation of rights doctrine, tribal members have possessed certain rights, such as hunting and fishing rights, from time immemorial. A treaty between a tribe and the United States documents a grant of some rights from the tribe to the federal government. However, those rights not expressly ceded in the treaty, as well as those expressly reserved, remain with the tribe. Johnson, *supra*, at 553.

The reservation of rights doctrine has consistently been applied to the fishing and hunting provisions of the Stevens Treaties. *See, e.g., Fishing Vessel*, 443 U.S. at 679-81; *Seufert Bros.*, 249 U.S. at 196.

██ ██ The treaty language at issue here is the following:

> The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians . . . together with the privilege of hunting . . . on open and unclaimed lands.

This court has interpreted the words "privilege" and "right," as used in the treaty, to be synonymous. *Miller,* 102 Wn.2d at 683. The United States Supreme Court has interpreted the treaty language "securing" or "secured" rights to be synonymous with "reserving" rights previously exercised. *Fishing Vessel*, 443 U.S. at 678.

██ ██ The State argues that the hunting right reserved by the treaty was limited to the right previously exercised—that is to the ceded lands or to lands upon which the Nooksack Tribe traditionally hunted. We agree.

The scope of a tribe's off-reservation hunting rights is

generally found in an Indian tribe's aboriginal use of or title to land and its reservation of the right in a treaty, or by agreement, executive order or statute. *See generally* FELIX S. COHEN, FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 441-46 (Rennard Strickland & Charles F. Wilkinson eds., 1982). Mr. Nye explains the origin of the right as follows:

> Though hunting rights can arise from various sources, most existing off-reservation hunting rights in the Pacific Northwest were reserved by tribes in treaties signed with the federal government between 1853 and 1871. Treaties were the primary means by which the federal government sought to provide for the orderly westward expansion of non-native society. In the typical treaty, the signatory Indians relinquished their rights to aboriginal lands in exchange for money and confinement to a reservation with distinct boundaries.
>
> The reservation system, in addition to minimizing confrontations between encroaching settlers and the resident Indians, was also intended to transform Indians into "a pastoral and civilized people." As a result, game populations were not one of the primary factors considered in the federal government's choice of reservation lands, and many tribes were removed to reservations located far from their traditional hunting grounds. In response to a strong desire on the part of tribes to retain access to these areas, treaties with Northwest Indians provided for . . . "the privilege of hunting . . . on open and unclaimed lands[.]" In essence, these treaty provisions preserved a portion of the aboriginal rights exercised by the signatory tribes.

Nye, *supra*, at 177-78 (footnotes omitted). *See also* Reynolds, *supra*, at 752 (because the tribes could have reserved their aboriginal hunting and fishing rights only on lands which they actually hunted and fished at the time of the treaty, the primary inquiry must determine whether the area allegedly protected by the treaty formed part of the tribe's aboriginal territory).

> To determine the existence of original Indian title to land, and the right to hunt and fish following from that title, courts have generally required a showing of actual use and occupancy

over an extended period of time. In *Mitchel v. United States* [34 U.S. (9 Pet.) 711 (1835)] the United States Supreme Court said:

> Indian possession or occupation was considered with reference to their habits and modes of life; their hunting grounds were as much in their actual possession as the cleared fields of the whites; and their rights to its exclusive enjoyment in their own way and for their own purposes were as much respected, until they abandoned them, made a cession to the government, or an authorized sale to individuals.

In claims against the United States based upon original title, a requirement of exclusive use and occupancy has been satisfied by a showing that two or more tribes jointly or amicably hunted in the same area to the exclusion of others. . . .

The existence of aboriginal hunting and fishing rights, however, does not necessarily turn upon the existence of original title to lands and is not dependent upon recognition in a treaty or act of Congress. Aboriginal rights remain in the Indians unless granted to the United States by treaty, abandoned, or extinguished by statute. When a treaty has been signed, aboriginal use may still be important to determine the extent of the rights reserved under the treaty.

Cohen, *supra*, at 442-43 (footnotes omitted).

There is no evidence in the record on appeal to support a finding that the Nooksack Tribe actually occupied or used, over an extended period of time, the Oak Creek Wildlife Area for hunting. The only area which the record shows the Tribe clearly used for hunting lies within the lands ceded to the United States in the treaty.

Defendant Buchanan argues that the Tribe's right to hunt does not depend on proof of aboriginal title or preexisting hunting practices and grounds. Instead, he claims the hunting right is based not on aboriginal title but on the treaty. In support of this argument, Buchanan points to fishing rights cases which interpret the phrase "usual and accustomed grounds and stations." These cases, he argues demonstrate that the treaty right to hunt or fish

does not depend on aboriginal title or use. Buchanan additionally argues that the treaty fishing right is a limited one that permits fishing only at the usual and accustomed places, but that the hunting right is limited only to "open and unclaimed lands."

The treaty fishing right which was reserved by the Indians in the Stevens' Treaties has been interpreted to provide a broad right to treaty tribes to fish outside of their ceded lands in all usual and accustomed fishing areas, without regard to whether these areas were part of the usual habitat of the tribe and without regard to whether there had been consistent and exclusive use of the areas. *United States v. Washington*, 384 F. Supp. at 332; *Fishing Vessel*, 443 U.S. at 666. The treaty fishing right has been interpreted as ensuring tribes a right to a fixed percentage of the number of harvestable fish, *United States v. Washington*, 384 F. Supp. at 343, and, further, interpreting the right as a permanent one, unless abrogated by Congress. *United States v. Washington*, 384 F. Supp. at 331-32.

In contrast, the treaty hunting right, by its terms, is of a temporary and self-limiting nature. The right was intended to diminish as lands became settled, without the need of congressional action. *See, e.g., Hicks*, 587 F. Supp. at 1165. The treaty hunting clause contained in the Stevens' Treaties has not received the extent of analysis to which the fishing clause has been subjected and, although *State v. Chambers*, 81 Wn.2d 929, noted that the defendant, a Yakama tribal member, killed a deer on privately-owned property at least 40 miles from the nearest territory ceded to the United States by the Yakamas in their treaty, the issue now before us has not previously been squarely addressed by this court. *See also Hicks*, 587 F. Supp. at 1164.

The Supreme Courts of Idaho and Montana, interpreting Stevens' Treaties, have held the treaty right is a reserved right "to hunt upon open and unclaimed land . . . at any time of the year in any of the lands ceded to the federal government though such lands are outside the boundary of their reservation." *Arthur*, 74 Idaho at 265; *see also State v.*

*Coffee,* 97 Idaho 905, 556 P.2d 1185 (1976); *State v. Stasso,* 172 Mont. 242, 563 P.2d 562 (1977) (relying on the Idaho cases).

Mr. Nye provides the following analysis:

> Treaty clauses reserving Indian rights to hunt on "open and unclaimed lands" . . . do not expressly limit these rights to ceded lands. However, treaties were reservations of aboriginal rights, and both the signatory tribes and the federal treaty negotiators understood that rights of access would be limited to traditional hunting grounds which remained "open and unclaimed" or "unoccupied."
>
> . . . If the principles of treaty construction are strictly followed . . . the right should be limited to the aboriginal hunting grounds of the signatory Indians. This line of demarcation should be based not on the treaty descriptions, but on other evidence which better captures the understanding of the Indians upon entering the treaty. Any line drawn must necessarily be approximate, and the principles of treaty interpretation require that any ambiguous questions be resolved in favor of the Indians.

Nye, *supra,* at 190-91 (footnotes omitted).

The geographic scope of the hunting right cannot be resolved from the language of the treaty alone. We hold that application of the reservation of rights doctrine is the more legally sound approach to interpreting the hunting rights provision of the Treaty of Point Elliott. Under such an analysis, open and unclaimed lands within the aboriginal hunting grounds of the Nooksack Tribe are reserved under the treaty for hunting by tribal members, so long as the lands remain open and unclaimed. The geographic area available for hunting would certainly include the territory ceded to the United States and described in article I of the Treaty of Point Elliott, and may include other areas if those areas are proven to have been actually used for hunting and occupied by the Nooksack Tribe over an extended period of time. Because the trial court did not so limit the geographic scope of the Nooksack's treaty, we reverse the dismissal of the charges against defendant Buchanan.

However, we hold that, on remand, the defendant should have the opportunity to prove that the Nooksack Tribe's aboriginal hunting grounds include the land within the Oak Creek Wildlife Area.

We next consider whether the Oak Creek Wildlife Area is "open and unclaimed land" under the meaning of the Treaty of Point Elliott.

Under article 5 of the treaty, the Nooksack Tribe has a right to hunt on open and unclaimed lands. The United States Supreme Court has held that the treaty right to hunt, like the treaty right to fish, may be regulated by the state only "in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." *Antoine*, 420 U.S. at 207 (citing *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398, 88 S. Ct. 1725, 20 L. Ed. 2d 689 (1968)). The "appropriate standards" requirement obligates the state to prove that its regulation is a "reasonable and necessary conservation measure, *and* that its application to the Indians is necessary in the interest of conservation." *Antoine*, 420 U.S at 207 (citation omitted). *See also Miller*, 102 Wn.2d at 688 n.5 ("We do not read *Antoine* as giving Indians the exclusive right to hunt, but rather as ensuring that their right to hunt is not impaired for purposes other than those of conservation.").

The trial court entered a finding of fact stating that the State had not produced any evidence that the treaty tribe hunters were capable of having a significant impact on the elk population in the Oak Creek area or in the State of Washington and, further, that the State had failed to sustain its burden of proving that the application of its regulations to Nooksack Indians or to Point Elliott Treaty hunters is necessary for conservation. The State did not assign error to this finding and, therefore, it is a verity on appeal. *State v. Smith*, 130 Wn.2d 215, 223, 922 P.2d 811 (1996); *State v. Echeverria*, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997). The question of whether the State's regulations, which closed the hunting season, restricted the tak-

ing of antlered elk and established a winter feeding station, are necessary conservation measures is not properly before the court.

We limit our inquiry to whether the Oak Creek Wildlife Area is open and unclaimed land within the meaning of the Treaty of Point Elliott.

 This court has previously interpreted the meaning of "open and unclaimed lands" as that term is used in Stevens' Treaties in two decisions. Under both decisions, publicly-owned lands are considered "open and unclaimed." In *Miller,* 102 Wn.2d at 680 n.2, the court held that national forest land is "open and unclaimed" land within the meaning of the treaty. In *Chambers,* 81 Wn.2d at 934, this court approved a jury instruction defining "open and unclaimed lands" as "lands which are not in private ownership." These decisions are consistent with those of other jurisdictions interpreting Stevens' Treaties. *See Stasso,* 172 Mont. at 248 (national forest service lands that have not been patented to a private person are open and unclaimed lands within the meaning of a Stevens' Treaty); *Arthur,* 74 Idaho at 261 (the term "open and unclaimed" land as used in a Stevens' Treaty was intended to include and embrace such lands as were not settled and occupied by the whites under possessory rights or patent or otherwise appropriated to private ownership and may include national forest reserve lands); *Coffee,* 97 Idaho 905 (privately-owned land is not open and unclaimed within the meaning of a Stevens' Treaty); *Confederated Tribes of Umatilla Indian Reservation v. Maison,* 262 F. Supp. 871 (D. Or. 1966) (national forests lands considered open and unclaimed under the terms of a Stevens' Treaty), *aff'd sub nom. Holcomb v. Confederated Tribes of Umatilla Indian Reservation,* 382 F.2d 1013 (9th Cir. 1967). *See also Hicks,* 587 F. Supp. at 1165 (trial court opined that the construction of "open and unclaimed lands" that best accommodates Indian hunting as settlement occurs and matures is that "open and unclaimed lands" include public lands put to uses consistent with an Indian hunting privilege).

The State, relying on *Hicks*, argues that once the hunting regulations with respect to elk went into effect, the use of the Oak Creek Wildlife Area for hunting was not a compatible use and, therefore, the lands were not open and unclaimed. Our acceptance of this argument would permit the State to avoid its burden of proving that regulations imposed on Indian treaty hunters are necessary for conservation purposes. *See Miller,* 102 Wn.2d at 688. The State has designated the Oak Creek Wildlife Area for use for hunting, fishing and recreation. Limits on these activities in the Oak Creek Wildlife Area are by State regulation. The regulations must comply with standards developed by this court and the United States Supreme Court, and be necessary for conservation if the regulations are restrictive of treaty rights. The trial court's unchallenged finding in this case is that the State has not met its burden in this regard.[8]

The State also relies on *State v. Cutler,* 109 Idaho 448, 708 P.2d 853 (1985), to support its argument that lands which are located in a State-owned wildlife area which is operated as a wintering range for elk and deer are not "open and unclaimed." The treaty interpreted in *Cutler* was not a Stevens' Treaty and the pertinent language of the treaty provided the Indians had the right to hunt on "unoccupied lands of the United States." The *Cutler* court held that the state wildlife area, which was converted from a privately-owned ranch, was "occupied" by the State of Idaho and that sufficient indicia of occupancy existed (fences, signs, cattle guards, cultivated fields, machinery, roads, campgrounds and buildings) to put the Indian hunters on notice that the land was not "unoccupied lands of

---

[8]Amicus Department of Fish and Wildlife additionally argues that the status of the land changes as regulations of the State change to close, control, restrict or otherwise put land to uses inconsistent with hunting. In essence, the Department argues that the land is open and unclaimed for elk hunting during the State's elk hunting season, but changes its status when State regulation closes the season in that particular area. This argument ignores established law governing when a State, by hunting regulations, can restrict treaty rights. *See Antoine v. Washington,* 420 U.S. 194, 206, 95 S. Ct. 944, 43 L. Ed. 2d 129 (1975); *State v. McCormack,* 117 Wn.2d 141, 143, 812 P.2d 483 (1991).

the United States." *Cutler,* 109 Idaho at 454. The State offered no evidence in this case that would bring it within the rationale of *Cutler.*

From the rulings in the various cases which discuss the issue, and in light of the treaty language, we discern that a general statement of the rule is that publicly-owned lands, which are not obviously occupied and which are put to a use which is compatible with hunting, are "open and unclaimed lands" under the terms of the Stevens' Treaties. Treaty hunters have a right to hunt on such lands, unrestricted by State regulation, unless the regulations are necessary for conservation purposes. *Miller,* 102 Wn.2d 678. In this case, the Oak Creek Wildlife Area is publicly owned, is obviously unoccupied, and its purposes are compatible with and, in fact, include hunting. The trial court and Court of Appeals correctly determined that the Oak Creek Wildlife Area is open and unclaimed land.

Finally, the State urges this court to hold that the federal statute creating the State of Washington and admitting the state "into the Union on an equal footing with the original States," Act of February 22, 1889, 25 Stat. 676, 678, impliedly abrogated the treaty hunting rights of Indians living in Washington.

In support of its argument the State primarily relies on *Ward v. Race Horse,* 163 U.S. 504, 16 S. Ct. 1076, 41 L. Ed. 244 (1896), a case in which the Supreme Court held that Congress, in admitting Wyoming to the Union on equal footing with the original states, effectively abrogated the Indian treaty hunting rights of certain treaty Indians in Wyoming. *See also Crow Tribe of Indians v. Repsis,* 73 F.3d 982 (10th Cir. 1995) (applying *Race Horse* to another treaty applicable to tribes residing within the State of Wyoming); *State v. McCoy,* 63 Wn.2d 421, 387 P.2d 942 (1963) (where this court held the treaty fishing rights of Indians who were parties to the Treaty of Point Elliott were impliedly abrogated by Washington's admission to the Union).

■■ After oral argument in this case, the United States Supreme Court effectively overruled *Race Horse* in

*Minnesota v. Mille Lacs*, 526 U.S. at 219 (Rehnquist, C.J., dissenting) (noting the majority's "apparent overruling *sub silentio*" of *Race Horse*). The Supreme Court rejected use of the equal footing language to find an abrogation of Indian treaty rights, holding "[t]reaty rights are not impliedly terminated upon statehood." *Mille Lacs*, 526 U.S. at 207.

This decision is consistent with the decisions over the past 100 years, since *Race Horse* was decided, in which the Supreme Court has clarified and refined the law governing interpretation and abrogation of Indian treaty hunting and fishing rights. In contrast to the language in *Race Horse*, where the Court discussed the treaty's "grant" of rights to the Indians, the Supreme Court now views the grant as one from the Indians, with a reservation of rights not granted. *Winans*, 198 U.S. at 381; *Fishing Vessel*, 443 U.S. at 680. The Court has further stated that although Congress has the sole power to eliminate a treaty right, *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 118 S. Ct. 789, 798, 139 L. Ed. 2d 773 (1998), its intention to abrogate Indian treaty rights must be clear and plain. *United States v. Dion*, 476 U.S. 734, 738, 106 S. Ct. 2216, 90 L. Ed. 2d 767 (1986). Absent explicit statutory language, the Court is "extremely reluctant" to find congressional abrogation of treaty rights. *Fishing Vessel*, 443 U.S. at 690. It therefore will not construe statutes as abrogating a treaty right in a backhanded way but will require "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Dion*, 476 U.S. at 739-40.

Furthermore, the Supreme Court has undermined the premise upon which *Race Horse* was decided by holding that "treaty rights to hunt, fish . . . are not irreconcilable with a State's sovereignty over the natural resources in the State." *Mille Lacs*, 526 U.S. at 204. Washington's enabling act, 25 Stat. 676 (1889), differs from the statute admitting Wyoming to the Union, in that the statute admitting

Washington reserves from Washington the right to control lands owned or held by any Indian or Indian tribe. 25 Stat. 676-77 (1889). This clause makes it clear that Congress had the Indians' treaty rights in mind when it created the State of Washington, but did not go on to expressly abrogate the treaty hunting rights. Under *Dion* and *Mille Lacs*, we are unable to hold that, in the enabling act, Congress impliedly abrogated Indian treaty rights. *Fishing Vessel*, 443 U.S. at 690.

Reversed.

DURHAM, SMITH, JOHNSON, MADSEN, ALEXANDER, TALMADGE, and SANDERS, JJ., and DOLLIVER, J. Pro Tem., concur.

Reconsideration denied August 3, 1999.